1

2

3

4

5

6

7

8               **IN THE UNITED STATES DISTRICT COURT**

9            **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11   JAMES C. STRINGER,                    No. CIV S-04-0551-LKK-CMK-P

12               Petitioner,

13        vs.                              <u>FINDINGS AND RECOMMENDATIONS</u>

14   MICHAEL HARRISON, et al.,

15               Respondents.

16   _____/

17               Petitioner, a state prisoner proceeding with appointed counsel, brings this petition

18   for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Pending before the court is petitioner's

19   amended petition for a writ of habeas corpus (Doc. 11), respondents' answer (Doc. 18), and

20   petitioner's supplement (Doc. 23).[1]

21   / / /

22   / / /

23   / / /

24

25   _____

26   [1]        Pursuant to the court's September 13, 2005, order, respondents were also invited
     to file a supplemental brief but have declined to do so.  Petitioner has not filed a traverse.

                                        1

# I. BACKGROUND

A. **Facts**[2]

The state court recited the following facts, and petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

> Defendant Cherie Lee Forstein and her 13-year-old son Chad moved to the Franklin Villa apartment complex in the summer of 1999. Conflicts arose with the neighbors, particularly between Chad and people she described as "the local gangsters." Forstein reported numerous threats and assaults to the police. She did not move out of the complex because she was unable to find a place that would accept Chad's Rottweiler. Forstein told her mechanic, Dean Madeiros, and her employer, Frank Munoz, that she would bring in some muscle to deal with the neighborhood problems. She explained that her "ex" was a bail bondsman who lived in San Francisco.
>
> Chad made friends with another teenager in the complex, the assault victim LaMarr. The friendship soured when Chad lost his pager and accused LaMarr of taking it. On another occasion, Chad sprayed – or threatened to spray – LaMarr with mace his mother had given him.
>
> During the same period, Forstein had several confrontations with Wanda Frazier, LaMarr's mother. After one incident, a friend informed Frazier that Forstein said she was going to "get one-eyed Jimmy and come back and kill" Frazier's children. Another time, Forstein yelled at Frazier, mentioned a gun, and said she would not take "this bullshit." She continued, "I'll kill all these mother fuckers."
>
> On September 7, 8, and 9, 1999, Forstein left telephone messages for Chad's father, the 78-year-old defendant Curtis Howard. She explained that Chad was in danger, and threatened to kill Howard if he failed to pay the money he owed so she could move.
>
> On Monday, September 20, 1999, Forstein stopped LaMarr outside her apartment on his way home from school. She grabbed him by the collar, pushed him against a tree, and told him Chad's father was a bail bondsman with a lot of power. Forstein said Chad's father knew someone named "one-eyed Jimmy," and other "crazy people," who would come to Sacramento and kill for him. LaMarr testified the threats were directed toward his brother and father.
>
> At that point, Frazier came out of her apartment across the alley, and the two women began yelling at each other. During the argument Forstein said, "I'm tired of you black niggers disrespecting my house." She told Chad to leave "the mother fuckers" alone because she was going to kill them.

---

[2]   Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct." Petitioner bears the burden of rebutting this presumption by clear and convincing evidence. See id. These facts are, therefore, drawn from the state court's opinion(s), lodged in this court. Petitioner may also be referred to as "defendant."

Forstein, Chad, and Chad's friend Keith Hodges went to Edna Jean Finch's house after the September 20 confrontation with Frazier.  Morris, LaMarr's older brother, ran up to the door.  Frazier, Morris' mother, stopped him from trying to get inside, saying "it's not worth it."  Forstein asked Chad to get the phone and call someone.  The line was busy the first time he tried to reach his father, but he tried again.  Chad dialed the number and handed the phone to Forstein.  Hodges overheard part of the conversation in which Forstein stated: "I got a job for you, come here as soon as possible, I need you to get rid of these two black niggers . . ."

Frazier saw Forstein leave the complex 45 minutes or an hour after the confrontation.  Forstein returned 20 minutes later, and pulled into her driveway.  At that point, Howard Morris, Sr., young Morris' father, pulled up and got out of his car.  He spoke with Forstein for a few minutes, and drove away with LaMarr.  Forstein followed them out of the complex.  Robert Price, the security guard, overheard Forstein tell Howard Morris, Sr., "[T]hat's okay, I get my fellows to come down here and teach you niggers something."  She also said, "I'm going to have one-eyed Jimmy come over and kill a bunch of you mothers."

Forstein and Chad went to San Francisco that night, and stayed with Howard for two days.  They returned to Sacramento on Wednesday, September 22.  Accompanying them in a separate car were Howard, and his driver, defendant James Stringer, who was a skip tracer in the bail bond business.  Both Howard and Stringer were armed.

Upon arriving at Franklin Villa, Forstein went to check her mail near where LaMarr was sitting.  She walked up to LaMarr, grabbed him by the hand, and said, "[L]ook what [you got yourself] into."  Around the same time, Forstein warned Finch and her son Donny that she had her people with her and things were going to "come down."

Shortly thereafter, Howard and Stinger got out of their car and approached LaMarr.  One of the men showed the boy a badge, and patted him down.  Both Howard and Stringer pointed their guns at LaMarr, and one stuck a gun in the 13-year-old boy's side.  Howard told LaMarr he was going to kick in his teeth.  LaMarr started to walk away.  Stringer grabbed him and smashed his hand against the mailbox, breaking two bones.

Forstein, Howard, Stringer, and Chad ended up at Forstein's apartment.  Forstein cleaned up the mess the dog left in their absence.  Chad and Stringer began playing Play Station.  Howard brought the guns from the car, put one gun under the mattress, kept the other gun with him, and went back outside.

Meanwhile, LaMarr ran to Shirley Hamilton's apartment and called 911.  He told the dispatcher that two men had threatened to arrest him and said they were coming to get his father and brother.  LaMarr went back outside to wait for an officer to arrive.  One police car drove up, but left immediately to take another call.  At that moment, Morris walked up with two friends.  Morris was 5 feet 11 inches tall, and weighed 207 pounds.  After hearing what had happened, Morris went inside Hamilton's apartment and called his mother.  He then went to his own house, grabbed a metal baseball bat, and headed for the door. LaMarr and the two other young men tried to block his way, but Morris left through an open window.  One witness heard Morris yell for Chad to come out with his

3

dog and nunchaks [sic].

There was conflicting testimony about the baseball bat.  However, the witnesses generally agreed Morris had nothing in his hands when he walked toward Howard.  The older man pulled out his gun and pointed it at Morris.  Morris held up his hands with his palms forward and began backing up.  Howard fired from a short distance away, and Morris fell to the ground.  Howard fired a second fatal shot at Morris's head.

Howard reloaded his gun, and warned members of the gathering crowd not to approach the victim.  Shortly thereafter, he surrendered peacefully to police officers.  Officer Michael Galipeau recounted that Howard stated as he approached, "[P]eople need to be getting killed on this corner trying to hurt my son, all these people need to get a life."  Later, at the police station, Galipeau asked Howard whether he had any sharp objects in his pockets.  Howard said he did not, and continued, "I would not want to hurt you, you have done nothing to me, I did what I came here to do and I'm done."

At trial, Howard testified in his own defense.  He admitted taking the gun with him when he left Forstein's house, and intentionally firing the shot that killed Morris.  However, he also stated, "I was afraid because he wanted to catch me to take my gun, and if he take my gun he going to kill me and Chad."  The defense introduced expert testimony that defendant suffered a stroke in 1996 which resulted in dementia.

**B.    Procedural History**

Petitioner was convicted of: (1) one count of second degree murder, in violation of California Penal Code § 187; (2) one count of assault with a firearm, in violation of California Penal Code § 245(a)(2); and (3) one count of being an ex-felon in possession of a firearm, in violation of California Penal Code § 12021(c)(1).  With enhancements, petitioner was sentenced to 27 years to life.

Petitioner filed a direct appeal with the California Court of Appeal, which affirmed in a reasoned opinion issued on October 1, 2002, and modified on denial of rehearing on October 30, 2002.  The California Supreme Court denied review without comment.

/ / /

/ / /

/ / /

/ / /

/ / /

## II.  STANDARDS OF REVIEW

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  The AEDPA does not, however, apply in all circumstances.  When it is clear that a state court has not reached the merits of a petitioner's claim, because it was not raised in state court or because the court denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal habeas court must review the claim de novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach petitioner's claim under its "relitigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing petition de novo where state court had issued a ruling on the merits of a related claim, but not the claim alleged by petitioner).  When the state court does not reach the merits of a claim, "concerns about comity and federalism . . . do not exist."  Pirtle, 313 F. 3d at 1167.

Where the AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F. 3d 1223, 1229 (9th Cir. 2001).

5

1          Under § 2254(d), federal habeas relief is available where the state court's decision

2   is "contrary to" or represents an "unreasonable application of" clearly established law.  In

3   Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the

4   Court), the United States Supreme Court explained these different standards.  A state court

5   decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the

6   Supreme Court on the same question of law, or if the state court decides the case differently than

7   the Supreme Court has on a set of materially indistinguishable facts.  See id. at 405.  A state

8   court decision is also "contrary to" established law if it applies a rule which contradicts the

9   governing law set forth in Supreme Court cases.  See id.  In sum, the petitioner must demonstrate

10  that Supreme Court precedent requires a contrary outcome because the state court applied the

11  wrong legal rules.  Thus, a state court decision applying the correct legal rule from Supreme

12  Court cases to the facts of a particular case is not reviewed under the "contrary to" standard.  See

13  id. at 406.  If a state court decision is "contrary to" clearly established law, it is reviewed to

14  determine first whether it resulted in constitutional error.  See Benn v. Lambert, 293 F.3d 1040,

15  1052 n.6 (9th Cir. 2002).  If so, the next question is whether such error was structural, in which

16  case federal habeas relief is warranted.  See id.  If the error was not structural, the final question

17  is whether the error had a substantial and injurious effect on the verdict, or was harmless.  See id.

18         State court decisions are reviewed under the far more deferential "unreasonable

19  application of" standard where it identifies the correct legal rule from Supreme Court cases, but

20  unreasonably applies the rule to the facts of a particular case.  See id.; see also Wiggins v. Smith,

21  123 S.Ct. 252 (2003).  While declining to rule on the issue, the Supreme Court in Williams,

22  suggested that federal habeas relief may be available under this standard where the state court

23  either unreasonably extends a legal principle to a new context where it should not apply, or

24  unreasonably refused to extend that principle to a new context where it should apply.  See

25  Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court

26  decision is not an "unreasonable application of" controlling law simply because it is an

6

1 erroneous or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade,

2 123 S.Ct. 1166, 1175 (2003).  An "unreasonable application of" controlling law cannot

3 necessarily be found even where the federal habeas court concludes that the state court decision

4 is clearly erroneous.  See Lockyer, 123 S.Ct. at 1175.  This is because ". . . the gloss of clear

5 error fails to give proper deference to state courts by conflating error (even clear error) with

6 unreasonableness."  Id.  As with state court decisions which are "contrary to" established federal

7 law, where a state court decision is an "unreasonable application of" controlling law, federal

8 habeas relief is nonetheless unavailable if the error was non-structural and harmless.  See Benn,

9 283 F.3d at 1052 n.6.

10          The "unreasonable application of" standard also applies where the state court

11 denies a claim without providing any reasoning whatsoever.  See Himes v. Thompson, 336 F.3d

12 848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000).   Such decisions

13 are considered adjudications on the merits and are, therefore, entitled to deference under the

14 AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982.

15 The federal habeas court assumes that the state court applied the correct law and analyzes

16 whether the state court's summary denial was based on an objectively unreasonable application

17 of that law.  See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

18

19                              **III.  DISCUSSION**

20          Petitioner raises the following claims in his amended petition: (1) the evidence

21 was insufficient to support petitioner's conviction for second degree murder; (2) the admission

22 of numerous hearsay statements made by Forstein, who did not testify at trial, violated

23 petitioner's right to confront and cross-examine; (3) the trial court erred in admitting edited

24 versions of recorded messages without allowing petitioner to introduce the entire recordings; (4)

25 the trial court erred with respect to jury instructions; (5) ineffective assistance of trial counsel for

26 failing to request certain jury instructions; and (6) jury misconduct.  Respondents concede that

1 these claims are exhausted.

2      A.      **Sufficiency of the Evidence**

3           Petitioner argues that the evidence was insufficient to support his conviction for

4 second degree murder on a theory of natural and probable consequences.  When a challenge is

5 brought alleging insufficient evidence, federal habeas corpus relief is available if it is found that,

6 upon the record of evidence adduced at trial, viewed in the light most favorable to the

7 prosecution, no rational trier of fact could have found proof of guilt beyond a reasonable doubt.

8 See Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Under Jackson, the court must review the

9 entire record when the sufficiency of the evidence is challenged on habeas.  See id.  It is the

10 province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw

11 reasonable inferences from basic facts to ultimate facts."  Id.  "The question is not whether we

12 are personally convinced beyond a reasonable doubt.  It is whether rational jurors could reach

13 the conclusion that these jurors reached."  Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).

14 The federal habeas court determines sufficiency of the evidence in the context of the substantive

15 elements of the criminal offense, as defined by state law.  See Jackson, 443 U.S. at 324 n.16.

16           In rejecting this argument, the California Court of Appeal reasoned:

17           Stringer argues that on the facts of this case, "the killing of
   Howard Morris cannot, as [a] matter of law, be determined to have been a
18 natural and probable consequence of any conduct committed by, agreed
   to, or aided and abetted by [him]."  He insists that "there was no evidence
19 to establish that the shooting of LaMarr's brother under the circumstances
   in which it occurred, was reasonably foreseeable as to [him]."  Thus, due
20 process requires reversal of his conviction.  Based on the standard of
   review applied in challenges to sufficiency of the evidence, we conclude
21 there is substantial evidence that Morris's killing was a natural and
   probable consequence of the assault on LaMarr.
22           Given the content of Forstein's telephone messages, and the fact
   she and Chad stayed with Howard in San Francisco for two days before
23 returning to Sacramento the day of the killing, the jury could reasonably
   infer that Howard knew Forstein's version of the circumstances
24 surrounding her claim LaMarr and his family were bullying Chad.  Chad
   told Howard that Howard Morris, Sr., Morris, and most of the people at
25 Franklin Villa had guns.  The jury could also infer Howard conveyed at
   least some of this information to Stringer while the two men were driving
26 to Sacramento.  In these circumstances, it was not unreasonable for the

jury to assume Stringer was aware of the tension between the two families.
This record also supports the inference that a reasonable person in Stringer's position would have or should have known that the killing was a reasonably foreseeable consequence of the assault on LaMarr. [citations omitted].  Howard and Stringer told LaMarr they were police, and threatened him at gunpoint.  Stringer smashed LaMarr's hand against the mailbox, breaking two bones.  In the subsequent call to 911, LaMarr told the dispatcher that his assailants said they were going to get his father and brother.  They jury could infer Howard and Stringer believed the same message would also be conveyed to Morris's family.  Howard prepared for a response.  He left one gun in the bedroom of Forstein's apartment, kept the other gun with him, and went outside.  Forstein, Stringer, and Chad waited inside the apartment.  It was for the jury to decide whether the 20-minute dely in Morris's arrival at the scene broke the causal chain.  On this record, we cannot say as a matter of law that it did.

Because it is clear from the foregoing that the state court applied the correct legal rules, this court must review petitioner's insufficiency of the evidence claim under the more deferential "unreasonable application of" standard.

Under California law, to find a defendant guilty under the natural and probable consequences doctrine, the jury must determine: (1) whether the defendant aided, promoted, encouraged, or instigated the commission of any target crime, with knowledge of the confederate's unlawful purpose, and with the intent of committing, encouraging, or facilitating the commission of the target crime; (2) whether the defendant's confederate committed an offense other than the target crime; and (3) whether the other offense committed by the confederate was a natural and probable consequence of the target crime that the defendant encouraged or facilitated.  See People v. Prettyman, 14 Cal.4th 248, 260 (1996).  Even where the defendant's specific intent only extends to assault with a firearm, a conviction for murder under the natural and probable consequences theory is proper if the murder was foreseeable.  See People v. Bunyard, 45 Cal.3d 1189, 1231-32 (1988).  Finally, it is for the jury – not the court – to determine whether the murder was foreseeable.  See People v. Gardner, 37 Cal.App. 4th 473, 483 (1995).

/ / /

/ / /

9

1       In light of the foregoing, the question for this court is whether the jury could have

2  reasonably concluded that the murder was foreseeable.  For the same reasons articulated by the

3  state court, this court concludes that a reasonable jury could have made the inferences necessary

4  in this case.  Or, to put it another way, the record does not establish that no rational jury could

5  have concluded the murder was foreseeable.  Therefore, the state court's decision was not an

6  unreasonable application of federal law.

7       In his supplement, addressing the applicability of <u>Juan H. v. Allen</u>, 408 F.3d 1262

8  (9th Cir. 2005) to this case, petitioner argues that "the state court engaged . . . in speculation

9  when it ruled that because Forstein made threatening phone calls to Curtis Howard and because

10 petitioner drove Howard to Sacramento that 'at least some of this information' had been

11 conveyed to petitioner by Howard."  Petitioner concludes, therefore, that the jury could not have

12 reasonably drawn the inference, as described by the state court, that "a reasonable person in

13 Stringer's position would have or should have known that the killing was a reasonably

14 foreseeable consequence of the assault on LaMarr."  In support of his argument, petitioner

15 contends that "there was no evidence to show that petitioner had any kind of relationship to

16 Howard or his family that provided a motive for [petitioner] to become involved in an effort to

17 hurt much less kill a member of [Howard's] family."  Petitioner also asserts that "there was no

18 evidence to indicate that [petitioner] was aware of the tensions between the families or that he

19 was accompanying Howard as anything other than a driver.

20      The court disagrees.  While petitioner is correct that a reasonable inference must

21 be based on a logical connection from one fact to another, petitioner is incorrect in asserting that

22 such a logical chain does not exist in this case.  The question is whether petitioner knew enough

23 about the situation with Forstein and her son to support the conclusion that the murder was a

24 natural and probable consequence of the target crime.  The court finds there is sufficient

25 evidence to establish the logical chain necessary to support the inferences required to conclude

26 that the murder was a natural and probable consequence.  Specifically, the following facts

support the inference:

1.     Forstein said that she was going to "get my fellows to come down here and teach you niggers something;"

2.     Forstein also said, "I'm going to have one-eyed Jimmy come over and kill a bunch of you mothers;"

3.     Forstein said Chad's father [Howard] knew someone named "one-eyed Jimmy," and other "crazy people," who would come to Sacramento and kill for him;

4.     Petitioner's first name is James and he is friends with Howard, having worked together in the bail bond business;

5.     Forstein told Howard about the problems at the apartment complex;

6.     Forstein and Chad went to stay with Howard in San Francisco for two days;

7.     Just after this visit, Howard and petitioner returned with Forstein and Chad to Sacramento;

8.     Both Howard and petitioner were armed on this return trip;

9.     Forstein told Finch and her son that she had "her people" with her and that things were going to "come down;"

10.     Both Howard and petitioner confronted LaMarr and pointed their guns at him;

11.     Petitioner smashed LaMarr's hand on the mailbox; and

12.     After this, Howard, Forstein, Chad, and petitioner returned to Forstein's apartment together.

It is reasonable to infer from these facts that petitioner is "one-eyed Jimmy." Also, because both petitioner and Howard were armed on their trip to Sacramento following Forstein's visit, it is reasonable to infer that they were both returning for the same reason – to "take care" of LaMarr and his mother. Supporting this inference is the fact that, upon arriving at the apartment complex in Sacramento, both Howard and petitioner actually drew their guns on LaMarr. Finally, petitioner, Howard, Forstein, and Chad all returned to the same apartment (Forstein's) after this confrontation. It is clear from all this that petitioner was far more than simply Howard's driver. If he were just a driver, he would not have also brought a gun, drew it on

1  LaMarr, or smashed LaMarr's hand.   Moreover, Forstein would not have referred to "her

2  people" – an obvious reference to more than one person – if only Howard was going to make

3  things to "come down."  In sum, the court concludes that a reasonable jury could infer from these

4  facts that petitioner was brought along as Howard's "muscle" and that petitioner intended to

5  fulfill that role.

6           **B.      Admission of Hearsay**

7           Petitioner argues that hearsay evidence was improperly admitted.  In particular,

8  petitioner complains about out-of-court statements made by Forstein in the form of phone

9  messages she left on Howard's answering machine and statements she made to family and

10  friends.

11          The Confrontation Clause protects a defendant from unreliable hearsay evidence

12  being presented against him during trial.  See U.S. Constitution, Amendment VI.  Prior to the

13  Supreme Court's decision in Crawford v. Washington, 541 U.S. 36 (2004), the admission of

14  hearsay evidence did not violate the Confrontation Clause where the hearsay fell within a firmly

15  rooted exception to the hearsay rule and otherwise contained "particularized guarantees of

16  trustworthiness."  Lilly v. Virginia, 527 U.S. 116, 123-24 (1999); Ohio v. Roberts, 448 U.S. 56,

17  66 (1980).  In Crawford, however, the Supreme Court announced a new rule:  Out-of-court

18  statements by witnesses not appearing at trial that are testimonial are barred under the

19  Confrontation Clause unless the witnesses are unavailable and the defendant had a chance to

20  cross-examine, regardless of whether such statements are deemed reliable by the trial court.  See

21  541 U.S. at 51.

22          While the Supreme Court in Crawford "le[ft] for another day any effort to spell

23  out a comprehensive definition of 'testimonial,'" the Court provided some guidance. 541 U.S. at

24  68.  The Court observed that "[a]n accuser who makes a formal statement to government officers

25  bears testimony in a sense that a person who makes a casual remark to an acquaintance does

26  not."  Id. at 51; see also Davis v. Washington, ___U.S.___, 126 S.Ct. 2266 (2006) (holding that

1  law enforcement interrogations directed at establishing the facts of a past crime or in order to

2  identify the perpetrator are testimonial).

3       Although the Crawford rule was not clearly established law at the time that the

4  criminal proceedings in petitioner's case took place, the Ninth Circuit held in Bockting v. Bayer,

5  that the Crawford rule should be applied retroactively on collateral review.  See 399 F.3d 1010,

6  as amended on denial of rehearing by 408 F.3d 1127 (9th Cir. 2005).  Accordingly, the court

7  recognizes that, under Bockting, extending the holding of Crawford to the instant case does not

8  violate the non-retroactivity principle set forth in Teague v. Lane, 489 U.S. 288 (1989).[3]

9       In considering this claim, the state court applied Lilly v. Virginia and Ohio v.

10  Roberts.  Because it did not apply the new rule of Crawford – which is retroactive – it did not

11  apply the correct rule of law.  Thus, this court must review under the "contrary to" standard.

12  Under this standard, the court's task is to determine first whether the state court decision resulted

13  in constitutional error.  See Benn, 293 F.3d at 1052 n.6.  Because a Confrontation Clause

14  violation is a structural error, see Bockting, 399 F.3d at 1019-20, harmless error analysis is not

15  appropriate and habeas relief is warranted if constitutional error is found, see Benn, 293 F.3d at

16  1053 n.6.

17       Applying Crawford to determine whether the state court's decision, which

18  affirmed the trial court's admission of hearsay evidence, resulted in constitutional error, the

19  question for this court is whether the admission of hearsay violated the Confrontation Clause.

20

21      [3]    In Teague v. Lane, the Supreme Court held that new constitutional rules of
criminal procedure will not be applicable to those cases which have become final before the new

22  rules are announced unless they fall within two exceptions to the general rule.  See 489 U.S. 288
(1989).  The two exceptions are if the new constitutional rule of criminal procedure would "place

23  certain kinds of primary, private individual conduct beyond the power of criminal-law making
authority..." or "require the observance of 'those procedures that...are 'implicit in the concept of

24  ordered liberty.'"  Id. at 307; see also, Sawyer v. Smith, 497 U.S. 227, 242 (1990) (stating that
rules are properly considered retroactive when they alter our understanding of the bedrock

25  procedural elements essential to the fairness of a proceeding).  In Bockting, the Ninth Circuit
held that Crawford applied retroactively because it altered the understanding of the bedrock

26  procedural elements essential to the fairness of a proceeding. See 399 F.3d at 1019-20.

1   The court concludes that it did not because none of the out-of-court statements challenged by

2   petitioner were testimonial.  See United States v. Manfre, 386 F.3d 832 (8th Cir. 2004); Horton

3   v. Allen, 370 F.3d 75 (1st Cir. 2004).

4   **C.    Admission of Edited Tape Recordings**

5        Petitioner claims that the trial court erred by admitting edited versions of tape

6   recorded phone messages Forstein left on Howard's answering machine.  Petitioner asserts that

7   the entire tape recordings should have been presented to the jury in order to present a complete

8   picture of Forstein's state of mind.  A writ of habeas corpus is available under 28 U.S.C. § 2254

9   only on the basis of a transgression of federal law binding on the state courts.  See Middleton v.

10  Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir.

11  1983).  It is not available for alleged error in the interpretation or application of state law.

12  Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987);

13  Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be utilized

14  to try state issues de novo.  See Milton v. Wainwright, 407 U.S. 371, 377 (1972).

15        However, a "claim of error based upon a right not specifically guaranteed by the

16  Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so

17  infects the entire trial that the resulting conviction violates the defendant's right to due process."

18  Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th

19  Cir. 1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941).  Because federal habeas

20  relief does not lie for state law errors, a state court's evidentiary ruling is grounds for federal

21  habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due

22  process.  See Drayden v. White, 232 F.3d 704, 710 (9th Cir. 2000); Spivey v. Rocha, 194 F.3d

23  971, 977-78 (9th Cir. 1999); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991); see

24  also Hamilton v. Vasquez, 17 F.3d 1149, 1159 (9th Cir. 1994).   In order to raise such a claim in

25  a federal habeas corpus petition, the "error alleged must have resulted in a complete miscarriage

26  of justice."  Hill v. United States, 368 U.S. 424, 428 (1962); Crisafi v. Oliver, 396 F.2d 293, 294-

95 (9th Cir. 1968); <u>Chavez v. Dickson</u>, 280 F.2d 727, 736 (9th Cir. 1960).

To prevail, petitioner must demonstrate that admission of the edited tape recordings, as opposed to the complete records, rendered his trial fundamentally unfair. Petitioner argues that the ruling was fundamentally unfair because it precluded him from presenting a defense by preventing the jury from seeing relevant defense evidence (i.e., the full recordings). Specifically, petitioner claims that, had the jury heard the entire tape recordings, they would have concluded that they were the desperate ranting of an out-of-control woman. However, the court cannot say that admission of the edited tapes resulted in a complete miscarriage of justice. Even if the jury believed that Forstein was ranting and out of control, they could also reasonably have concluded that she solicited Howard as "muscle." One does not necessarily exclude the other.

### D.   <u>Jury Instructions</u>

Petitioner raises five claims relating to jury instructions. First, he argues that the trial court erred in modifying CALJIC No. 6.24. Second, petitioner argues that the trial court erred in modifying CALJIC No. 6.10.5. Third, petitioner argues that the court failed to instruct the jury under CALJIC No. 6.21. Fourth, petitioner contends that the trial court failed to instruct the jury under CALJIC No. 6.16. Finally, petitioner claims that the trial court erred with respect to the self-defense instructions.

A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of a transgression of federal law binding on the state courts. <u>See</u> <u>Middleton v. Cupp</u>, 768 F.2d 1083, 1085 (9th Cir. 1985); <u>Gutierrez v. Griggs</u>, 695 F.2d 1195, 1197 (9th Cir. 1983). It is not available for alleged error in the interpretation or application of state law. <u>Middleton</u>, 768 F.2d at 1085; <u>see</u> <u>also</u> <u>Lincoln v. Sunn</u>, 807 F.2d 805, 814 (9th Cir. 1987); <u>Givens v. Housewright</u>, 786 F.2d 1378, 1381 (9th Cir. 1986). Habeas corpus cannot be utilized to try state issues de novo. <u>See</u> <u>Milton v. Wainwright</u>, 407 U.S. 371, 377 (1972). Thus, a challenge to jury instructions does not generally give rise to a federal constitutional claim. <u>See</u> <u>Middleton</u>, 768

1   F.2d at 1085) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).

2          However, a "claim of error based upon a right not specifically guaranteed by the

3   Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so

4   infects the entire trial that the resulting conviction violates the defendant's right to due process."

5   Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th

6   Cir. 1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941).  In order to raise such a

7   claim in a federal habeas corpus petition, the "error alleged must have resulted in a complete

8   miscarriage of justice."  Hill v. United States, 368 U.S. 424, 428 (1962); Crisafi v. Oliver, 396

9   F.2d 293, 294-95 (9th Cir. 1968); Chavez v. Dickson, 280 F.2d 727, 736 (9th Cir. 1960).

10         In general, to warrant federal habeas relief, a challenged jury instruction "cannot

11  be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due

12  process right guaranteed by the fourteenth amendment."  Prantil v. California, 843 F.2d 314, 317

13  (9th Cir. 1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)).  To prevail, petitioner

14  must demonstrate that an erroneous instruction "'so infected the entire trial that the resulting

15  conviction violates due process.'"  Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp,

16  414 U.S. at 147).  In making its determination, this court must evaluate the challenged jury

17  instructions "'in the context of the overall charge to the jury as a component of the entire trial

18  process.'"  Prantil, 843 F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir.

19  1984)).  Further, in reviewing an allegedly ambiguous instruction, the court "must inquire

20  'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a

21  way' that violates the Constitution."  Estelle, 502 U.S. at 72 (quoting Boyde v. California, 494

22  U.S. 370, 380 (1990)).  Petitioner's burden is "especially heavy" when the court fails to give an

23  instruction.  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

24         It is well-established that the burden is on the prosecution to prove each and every

25  element of the crime charged beyond a reasonable doubt.  See In re Winship, 397 U.S. 358, 364

26  (1970).  Therefore, due process is violated by jury instructions which use mandatory

1   presumptions to relieve the prosecution's burden of proof on any element of the crime charged.

2   See Francis v. Franklin, 471 U.S. 307, 314 (1985); see also Sandstrom v. Montana, 442 U.S. 510

3   (1979).  A mandatory presumption is one that instructs the jury that it must infer the presumed

4   fact if certain predicate facts are proved.  See Francis, 471 U.S. at 314.  On the other hand, a

5   permissive presumption allows, but does not require, the trier of fact to infer an elemental fact

6   from proof of a basic fact.  See County Court of Ulster County v. Allen, 442 U.S. 140, 157

7   (1979).  The ultimate test of the constitutionality of any presumption remains constant –  the

8   instruction must not undermine the factfinder's responsibility at trial, based on evidence adduced

9   by the government, to find the ultimate facts beyond a reasonable doubt.  See id. at 156 (citing In

10  re Winship, 397 U.S. at 364).

11  _____  1.   Modification of CALJIC No. 6.24

12  CALJIC No. 6.24 reads:

13          Evidence of a statement made by one alleged conspirator other
    than at this trial shall not be considered by you as against another alleged
14  conspirator unless you determine:
            1.      That from other independent evidence that at the time the
15  statement was made a conspiracy to commit a crime existed;
            2.      That the statement was made while the person making the
16  statement was participating in the conspiracy and that the person against
    whom it was offered was participating in the conspiracy before or during
17  that time; and
            3.      That the statement was made in furtherance of the objective
18  of the conspiracy.
            The word "statement" as used in this instruction includes any oral
19  or written verbal expression or the nonverbal conduct of a person intended
    by that person as a substitute for oral or written verbal expression.

20

21  The trial court modified this instruction by adding the following language:

22          However, statements of intent to do a future act may be considered
    for any purpose or against any defendant.
23

24  Petitioner argues that this modification improperly allowed all of Forstein's out-of-court

25  statements to be admitted and concludes, therefore, that the modification violated his right to

26  confront witnesses against him.  The court finds no constitutional error because, as discussed

                                            17

above, none of Forstein's out-of-court statements were testimonial in nature.  Therefore, the

Confrontation Clause could not have been offended by admission of any of her statements.  For

this reason, the modification of CALJIC No. 6.24 could not have resulted in violation of

petitioner's rights under the Confrontation Clause.

### 2.   Modification of CALJIC No. 6.10.5

Petitioner claims that the trial court erroneously modified CALJIC No. 6.10.5 in

such a way that the target crime was left to the jury's imagination, thereby reducing the

prosecution's burden on the conspiracy charge.  As to CALJIC No. 6.10.5, the state court said:

> In Prettyman, 14 Cal.4th at 267-68, the Supreme Court held that
> instructions on aiding and abetting must identify the target crime or crimes
> the defendant is alleged to have assisted or encouraged to assist the jury in
> determining whether the crime charged was a natural and probable
> consequence of some other criminal act.  Where the natural and probable
> consequences doctrine applies, "a conviction may not be based on the
> jury's generalized belief that the defendant intended to assist and/or
> encourage unspecified 'nefarious' conduct."  The Court acknowledged
> that the natural and probable consequences doctrine applies equally to
> aiders and abettors and conspirators.
>      Here, the court identified the target crime as that "committed
> against LaMarr Morris" in its instructions on aiding and abetting.  The
> instructions also informed the jury that Stringer and Howard were charged
> in count two with assault with a firearm . . ., which included the lesser
> crime of battery. . . .  The court identified LaMarr as the victim in count
> two on at least two occasions.  Stringer's counsel acknowledged in closing
> argument that with respect to the aiding and abetting instructions, "there's
> only two crimes that are defined for you.  One is the . . . assault with a
> deadly weapon, and the other is a battery."
>      With respect to conspiracy, the court modified CALJIC No. 6.10.5
> . . . which read: "A conspiracy is an agreement between two or more
> persons with the specific intent to commit the crime of _____,
> and with the further specific intent to commit that crime, . . ."  Instead, it
> instructed the jury that "a conspiracy is an agreement between two or
> more persons with the specific intent to agree to commit a crime and with
> the further specific intent to commit that crime."  (emphasis added in
> original).
>      Stringer maintains the modified version of CALJIC No. 6.10.5
> failed to satisfy the Prettyman standard.  The instruction "provided no
> guidance to the jury about what the object of this alleged agreement
> among the defendants might have been."  He contends the instruction was
> erroneous "because it left the imagined target to the jury's imagination,
> and the other instructions did not correct the possibility that the jury
> would rely on noncriminal conduct."
>      We emphasize once again that instructional error """cannot be

18

predicated upon an isolated phrase, sentence or excerpt taken from the instructions . . . since, in order to determine the correctness . . . in their relations to and with each other and in the light of the instructions as a whole and whether a jury has been correctly instructed is not to be determined from a consideration of a part of an instruction or one particular instruction, but from the entire charge of the court."'" (citations omitted).  The instructions on aiding and abetting and the charges in count two informed the jury of the target crimes.  The court identified LaMarr as the victim in count two, and in no other count.  Indeed, the jury convicted Stringer of assault with a firearm in count two, and could not have mistaken the relationship between that finding and application of the natural and probable consequences doctrine.  Accordingly, we conclude that the instructions adequately informed the jury of the target crimes.

As the state court reasoned, other instructions and the charges themselves made it clear to the jury that the target crimes were assault with a deadly weapon or the lesser offense of battery.  Moreover, it was clear to the jury that LaMarr was the victim of the target offense. Therefore, contrary to petitioner's assertion, these items were not left to the jury's imagination.

3.    Failure to Instruct Under CALJIC No. 6.21

Petitioner asserts that the trial court failed to instruct the jury on when the conspiracy ended and argues that this deprived him of his defense that the conspiracy ended "at the time LaMarr was sent back inside after his encounter with petitioner and Howard."  With respect to CALJIC No. 6.21, the state court concluded:

Under well-established law, a conspiracy "usually comes to an end when the substantive crime for which the coconspirators are being tried is either attained or defeated. [Citations.] It is for the trier of fact – considering the unique circumstances and the nature and purpose of the conspiracy of each case – to determine precisely when the conspiracy has ended [Citations.]" (citations omitted).
"A criminal defendant is entitled, on request, to a[n] instruction 'pinpointing' the theory of his defense." (citations omitted).  As a defense to criminal liability under the prosecution's conspiracy theory, Stringer argued that if there was a conspiracy at all, it ended after the assault on LaMarr.  He was playing video games with Chad at the time of Howard's encounter with Morris.  Stringer argues on appeal that he was denied effective assistance of counsel because his trial attorney failed to request CALJIC No. 6.21.  That instruction reads: "No act or declaration of a conspirator committed or made after the conspiracy has been terminated is binding upon co-conspirators, and they are not criminally liable for any such act."
We conclude other instructions adequately covered the principles set forth in CALJIC No. 6.21.  These include CALJIC Nos. 6.16, 6.17,

6.19, and 6.20.  Accordingly, Stringer suffered no prejudice from his counsel's failure to request CALJIC No. 6.21.

While petitioner's federal claim is not couched in terms of ineffective assistance of counsel, the state court's reasoning is equally applicable.  Specifically, this court agrees with the state court that other jury instructions pinpointed petitioner's defense theory regarding liability for acts occurring after the conspiracy ended.  The record reflects that the trial court instructed the jury, in relevant part, as follows:

> A member of a conspiracy is liable for the acts and declarations of his or her co-conspirators until he or she effectively withdraws from the conspiracy or the conspiracy has terminated.

This is the converse of the instruction petitioner contends should have been read and conveys the same law – a conspirator is not liable for the acts of co-conspirators taken after the conspiracy has terminated.  Therefore, there is no merit to this claim.

### 4.   Failure to Instruct Under CALJIC No. 6.16

Petitioner asserts that the trial court erred by failing to instruct under CALJIC No. 6.16, which reads:

> Where a conspirator commits an act or makes a declaration which is neither in furtherance of the object of the conspiracy nor the natural and probable consequence of an attempt to attain that object, [he][she] alone is responsible for and is bound by that act or declaration, and no criminal responsibility therefor attaches to any of [his][her] confederates.

As respondents note, however, this instruction was in fact given.

### 5.   Self-Defense Instruction

Finally, petitioner claims that the trial court's self-defense instructions essentially created strict liability.  The trial court instructed the jury under CALJIC Nos. 5.54 and 5.55, which read:

> The right of self-defense is only available to a person who initiated an assault if he has done all the following:
> 1.   He has actually tried in good faith to refuse to continue fighting;
> 2.   He has clearly informed his opponent that he wants to stop fighting; and

20

      3.       He has clearly informed his opponent that he has stopped fighting.

      The right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent necessity of exercising self-defense.

The state court addressed this claim as follows:

> Counsel for Stringer . . . asked the court to remove CALJIC No. 5.54, self-defense by an aggressor, from the packet of written instructions given to the jury, and inform the jury that it did not apply to the facts of the case. The prosecution argued the instruction was appropriate because there was evidence Howard was the aggressor. "[Howard's] the one that pulled out a gun, not the victim. The victim is just walking across the street." The court declined to withdraw CALJIC No. 5.54, acknowledging the possibility the jury could find that Howard was the aggressor.
>
> On appeal, Stringer argues that the court erred in reading CALJIC Nos. 5.54 and 5.55 "because Curtis Howard was not the aggressor in the contact with Morris. These instructions improperly restricted defendant Howard's right of self-defense and thus his murder conviction cannot stand. Because [Stringer's] liability is derivative of Howard's, [his] conviction must also be reversed." He says the error was exacerbated by the prosecution argument that self-defense was not available to Howard because of the earlier confrontation with LaMarr.
>
> The principal difficulty with Stringer's argument is that there was conflicting evidence regarding the respective roles played by Howard and Morris in the confrontation that resulted in Morris's death. Contrary to Stringer's contentions, the earlier assault on LaMarr was relevant to Howard's claim of self-defense, and the level of his criminal liability for the killing. There is evidence Morris was in a rage when he heard what had happened to LaMarr. He grabbed a baseball bat, climbed through the window of his home, and went to Shirley Hamilton's to call his mother. Morris had calmed down a bit when he took off his shirt, started across the alley, and said in a loud voice, "shouldn't be F'ing with my family." One witness heard Morris yell for Chad to come out with his dog and nunchaks. At the same time, the witnesses generally agreed Morris was unarmed when he approached Howard. Indeed, Howard himself testified he saw nothing in Morris's hands. When Morris got close to Howard, the older man pulled out a gun and shot him.
>
> There was also conflicting evidence on the question whether, as argued by Stringer, there was a "complete break in the chain of events" – that is, between the assault on LaMarr and the killing of Morris. As we explained, it was the for the jury to decide whether "a particular criminal act was a natural and probable consequence of another criminal act aided and abetted by a defendant . . . ."
>
> On this record, we cannot say that the challenged self-defense instructions did not apply as a matter of law. It was left to the jury to decide what happened, and to apply CALJIC Nos. 5.54 and 5.55 if appropriate to the facts of the case.

1    As the state court observed, petitioner's claim arises from the incorrect

2  characterization of the facts as being conclusive as a matter of law that Howard was not the

3  aggressor and that Morris was.  This is not the case.  While the witnesses tended to agree that

4  Morris did not have anything in his hands as he approached Howard, other witnesses said he had

5  grabbed a baseball bat.  It was for the jury to decide who was the aggressor and to apply the

6  instructions based on that factual finding.  The instructions did not mislead the jurors into

7  believing that they had to conclude any particular person was the aggressor.  This court,

8  therefore, cannot say that the state court's decision was either "contrary to" or an "unreasonable

9  application of" federal law.

10    **E.    Ineffective Assistance of Counsel**

11    Petitioner argues that his trial counsel was ineffective for failing to request

12  instructions under CALJIC Nos. 6.16 and 6.21.  The Sixth Amendment guarantees the effective

13  assistance of counsel.  The United States Supreme Court set forth the test for demonstrating

14  ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984).  First, a

15  petitioner must show that, considering all the circumstances, counsel's performance fell below

16  an objective standard of reasonableness.  See id. at 688.  To this end, petitioner must identify the

17  acts or omissions that are alleged not to have been the result of reasonable professional

18  judgment.  See id. at 690.  The federal court must then determine whether, in light of all the

19  circumstances, the identified acts or omissions were outside the wide range of professional

20  competent assistance.  See id.  In making this determination, however, there is a strong

21  presumption "that counsel's conduct was within the wide range of reasonable assistance, and that

22  he exercised acceptable professional judgment in all significant decisions made."  Hughes v.

23  Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

24    Second, a petitioner must affirmatively prove prejudice.  See Strickland, 466 U.S.

25  at 693.  Prejudice is found where "there is a reasonable probability that, but for counsel's

26  unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A

1  reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.;

2  see also Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not

3  determine whether counsel's performance was deficient before examining the prejudice suffered

4  by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an

5  ineffectiveness claim [for] lack of sufficient prejudice . . . that course should be followed."

6  Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

7           As to CALJIC No. 6.16, this instruction was given.   As to CALJIC No. 6.21, for

8  the reasons discussed above, the court concludes that the trial court's other instructions conveyed

9  the same legal concept.   Therefore, petitioner was not prejudiced by counsel's failure to request

10  either instruction.

11      **F.      Jury Misconduct**

12           Finally, petitioner claims jury misconduct.  The state court provided the following

13  background:

14           Here, the claims of misconduct arose on the tenth day of trial, when
         the bailiff informed the court that three female jurors felt uncomfortable
15       because of the way Stringer was looking at them.  The court and counsel
         discussed the matter the following morning outside the presence of the
16       jury.  Forstein's counsel moved to exclude Juror Nos. 4 and 5, and alternate
         No. 3 for cause.
17           Questioning of the three jurors by the court and counsel revealed
         that the women were bothered by Stringer's attempt to make eye contact
18       with them, and by his body language in response to witness testimony.
         Juror No. 4 had noticed the problem the week before.  All three admitted
19       speaking with each other before they approached the bailiff with their
         concerns.  They also questioned Juror No. 11.  Juror Nos. 4 and 5, and
20       alternate No. 3 stated they could remain objective about the facts of the
         case as long as the court was aware of Stringer's conduct, and something
21       was done to stop it.  Juror No. 11 said she mentioned eye contact with a
         defendant to Juror No. 4.  She told the court the eye contact was with
22       Forstein.  However, Juror No. 11 told the court that the incident caused her
         no concern.  She had not heard any juror other than Juror No. 4 mention the
23       issue.

24  The state court then addressed petitioner's argument:

25           On appeal, Forstein and Stringer contend the court erred in ruling
         there was no jury misconduct and no further action was warranted.  They
26       argue the court should have replaced three of the jurors because the

reactions they reported amounted to information outside the record that affected their ability to be impartial.  Forstein and Stringer also maintain the court abused its discretion in failing to question all the jurors after four jurors admitted that they had discussed their observations and reactions with each other.

. . . We conclude the record supports the court's finding there was no misconduct, and the court did not abuse its discretion in denying the motions to excuse specific jurors, for mistrial, and for new trial.

* * *

Here, the court emphasized that the discussion among the jurors did not involve "any of the facts, testimony and issues of the trial other than their uncomfortable feeling and reaction to a defendant's conduct and what to do about it."  Moreover, Juror Nos. 4 and 5, and alternate Juror No. 3 assured the court that Stringer's and Forstein's attempts to make eye contact would not affect their ability to judge defendants fairly, as long as the conduct stopped.  Juror No. 11 said the incident caused her no concern.  There is no evidence the defendants continued their efforts to make eye contact with jurors after the conduct was brought to the court's attention.

. . . After questioning Juror Nos. 4, 5, and 11, and alternate No. 3, the court was satisfied they could continue to be fair and objective.

The Sixth Amendment guarantees a fair trial by an impartial jury.  See Irvin v. Dowd, 366 U.S. 717, 722 (1961); Tinsley v. Borg, 895 F.2d 520, 523 (9th Cir.1990).  If even a single juror is "unduly biased or prejudiced" the defendant has been denied his right to an impartial jury.  See Tinsley,895 F.2d at 523-24.   To establish misconduct in the context of failing to answer voir dire questions, petitioner must demonstrate that the juror failed to answer honestly, and that a correct response would have provided a basis for a challenge for cause.  See McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984); Tinsley, 895 F.2d at 524.

However, not every incident of juror misconduct or bias requires a new trial.  See United States v. Klee, 494 F.2d 394, 396 (9th Cir. 1974).  "The test is whether or not the misconduct has prejudiced the defendant to the extent that he has not received a fair trial."  Id.  On collateral review, if misconduct occurred, a petitioner must show that the alleged error "'had substantial and injurious effect or influence in determining the jury's verdict.'"  Jeffries v. Blodgett, 5 F.3d 1180, 1190 (9th Cir. 1993) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637

1   (1993)); <u>see also</u> <u>Hughes v. Borg</u>, 898 F.2d 695, 699 (1990).

2        In this case, petitioner cannot establish the requisite bias or prejudice.  All the

3   jurors in question specifically stated that they could remain fair and objective as long as

4   defendant's conduct stopped, which it did.  Therefore, the state court's adjudication of this claim

5   was neither "contrary to" or an "unreasonable application of" federal law.

6

7   **IV.  CONCLUSION**

8        Based on the foregoing, the undersigned recommends that petitioner's petition for

9   a writ of habeas corpus be denied and that the Clerk of the Court be directed to enter judgment

10  and close this file.

11       These findings and recommendations are submitted to the United States District

12  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within 20 days

13  after being served with these findings and recommendations, any party may file written objections

14  with the court.  The document should be captioned "Objections to Magistrate Judge's Findings

15  and Recommendations."  Failure to file objections within the specified time may waive the right

16  to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

17

18  DATED:   December 4, 2006.

19

20                                   _____
                                    **CRAIG M. KELLISON**

21                                   UNITED STATES MAGISTRATE JUDGE

22

23

24

25

26