1

2

3

4

5

6

7

8                    **IN THE UNITED STATES DISTRICT COURT**

9                **FOR THE EASTERN DISTRICT OF CALIFORNIA**

10

11  JAMES C. STRINGER,                    No. CIV S-04-0551-LKK-CMK-P

12              Petitioner,

13      vs.                               AMENDED FINDINGS AND
                                          RECOMMENDATIONS
14  MICHAEL HARRISON, et al.,

15              Respondents.

16  _____/

17              Petitioner, a state prisoner proceeding with appointed counsel, brings this petition

18  for a writ of habeas corpus pursuant to 28 U.S.C. § 2254.  Pending before the court is petitioner's

19  amended petition for a writ of habeas corpus (Doc. 11), respondents' answer (Doc. 18), and

20  petitioner's supplement (Doc. 23).[1]

21  / / /

22  / / /

23  / / /

24

25  _____

26      [1]      Pursuant to the court's September 13, 2005, order, respondents were also invited
    to file a supplement but have declined to do so.  Petitioner has not filed a traverse.

                                          1

# I. BACKGROUND

A.   **Facts**[2]

The state court recited the following facts, and petitioner has not offered any clear and convincing evidence to rebut the presumption that these facts are correct:

> Defendant Cherie Lee Forstein and her 13-year-old son Chad moved to the Franklin Villa apartment complex in the summer of 1999. Conflicts arose with the neighbors, particularly between Chad and people she described as "the local gangsters." Forstein reported numerous threats and assaults to the police. She did not move out of the complex because she was unable to find a place that would accept Chad's Rottweiler. Forstein told her mechanic, Dean Madeiros, and her employer, Frank Munoz, that she would bring in some muscle to deal with the neighborhood problems. She explained that her "ex" was a bail bondsman who lived in San Francisco.
>
> Chad made friends with another teenager in the complex, the assault victim LaMarr. The friendship soured when Chad lost his pager and accused LaMarr of taking it. On another occasion, Chad sprayed – or threatened to spray – LaMarr with mace his mother had given him.
>
> During the same period, Forstein had several confrontations with Wanda Frazier, LaMarr's mother. After one incident, a friend informed Frazier that Forstein said she was going to "get one-eyed Jimmy and come back and kill" Frazier's children. Another time, Forstein yelled at Frazier, mentioned a gun, and said she would not take "this bullshit." She continued, "I'll kill all these mother fuckers."
>
> On September 7, 8, and 9, 1999, Forstein left telephone messages for Chad's father, the 78-year-old defendant Curtis Howard. She explained that Chad was in danger, and threatened to kill Howard if he failed to pay the money he owed so she could move.
>
> On Monday, September 20, 1999, Forstein stopped LaMarr outside her apartment on his way home from school. She grabbed him by the collar, pushed him against a tree, and told him Chad's father was a bail bondsman with a lot of power. Forstein said Chad's father knew someone named "one-eyed Jimmy," and other "crazy people," who would come to Sacramento and kill for him. LaMarr testified the threats were directed toward his brother and father.
>
> At that point, Frazier came out of her apartment across the alley, and the two women began yelling at each other. During the argument Forstein said, "I'm tired of you black niggers disrespecting my house." She told Chad to leave "the mother fuckers" alone because she was going to kill them.

---

[2]   Pursuant to 28 U.S.C. § 2254(e)(1), ". . . a determination of a factual issue made by a State court shall be presumed to be correct." Petitioner bears the burden of rebutting this presumption by clear and convincing evidence. See id. These facts are, therefore, drawn from the state court's opinion(s), lodged in this court. Petitioner may also be referred to as "defendant."

Forstein, Chad, and Chad's friend Keith Hodges went to Edna Jean Finch's house after the September 20 confrontation with Frazier. Morris, LaMarr's older brother, ran up to the door. Frazier, Morris' mother, stopped him from trying to get inside, saying "it's not worth it." Forstein asked Chad to get the phone and call someone. The line was busy the first time he tried to reach his father, but he tried again. Chad dialed the number and handed the phone to Forstein. Hodges overheard part of the conversation in which Forstein stated: "I got a job for you, come here as soon as possible, I need you to get rid of these two black niggers . . ."

Frazier saw Forstein leave the complex 45 minutes or an hour after the confrontation. Forstein returned 20 minutes later, and pulled into her driveway. At that point, Howard Morris, Sr., young Morris' father, pulled up and got out of his car. He spoke with Forstein for a few minutes, and drove away with LaMarr. Forstein followed them out of the complex. Robert Price, the security guard, overheard Forstein tell Howard Morris, Sr., "[T]hat's okay, I get my fellows to come down here and teach you niggers something." She also said, "I'm going to have one-eyed Jimmy come over and kill a bunch of you mothers."

Forstein and Chad went to San Francisco that night, and stayed with Howard for two days. They returned to Sacramento on Wednesday, September 22. Accompanying them in a separate car were Howard, and his driver, defendant James Stringer, who was a skip tracer in the bail bond business. Both Howard and Stringer were armed.

Upon arriving at Franklin Villa, Forstein went to check her mail near where LaMarr was sitting. She walked up to LaMarr, grabbed him by the hand, and said, "[L]ook what [you got yourself] into." Around the same time, Forstein warned Finch and her son Donny that she had her people with her and things were going to "come down."

Shortly thereafter, Howard and Stinger got out of their car and approached LaMarr. One of the men showed the boy a badge, and patted him down. Both Howard and Stringer pointed their guns at LaMarr, and one stuck a gun in the 13-year-old boy's side. Howard told LaMarr he was going to kick in his teeth. LaMarr started to walk away. Stringer grabbed him and smashed his hand against the mailbox, breaking two bones.

Forstein, Howard, Stringer, and Chad ended up at Forstein's apartment. Forstein cleaned up the mess the dog left in their absence. Chad and Stringer began playing Play Station. Howard brought the guns from the car, put one gun under the mattress, kept the other gun with him, and went back outside.

Meanwhile, LaMarr ran to Shirley Hamilton's apartment and called 911. He told the dispatcher that two men had threatened to arrest him and said they were coming to get his father and brother. LaMarr went back outside to wait for an officer to arrive. One police car drove up, but left immediately to take another call. At that moment, Morris walked up with two friends. Morris was 5 feet 11 inches tall, and weighed 207 pounds. After hearing what had happened, Morris went inside Hamilton's apartment and called his mother. He then went to his own house, grabbed a metal baseball bat, and headed for the door. LaMarr and the two other young men tried to block his way, but Morris left through an open window. One witness heard Morris yell for Chad to come out with his

3

dog and nunchaks [sic].

There was conflicting testimony about the baseball bat.  However, the witnesses generally agreed Morris had nothing in his hands when he walked toward Howard.  The older man pulled out his gun and pointed it at Morris.  Morris held up his hands with his palms forward and began backing up.  Howard fired from a short distance away, and Morris fell to the ground.  Howard fired a second fatal shot at Morris's head.

Howard reloaded his gun, and warned members of the gathering crowd not to approach the victim.  Shortly thereafter, he surrendered peacefully to police officers.  Officer Michael Galipeau recounted that Howard stated as he approached, "[P]eople need to be getting killed on this corner trying to hurt my son, all these people need to get a life." Later, at the police station, Galipeau asked Howard whether he had any sharp objects in his pockets.  Howard said he did not, and continued, "I would not want to hurt you, you have done nothing to me, I did what I came here to do and I'm done."

At trial, Howard testified in his own defense.  He admitted taking the gun with him when he left Forstein's house, and intentionally firing the shot that killed Morris.  However, he also stated, "I was afraid because he wanted to catch me to take my gun, and if he take my gun he going to kill me and Chad."  The defense introduced expert testimony that defendant suffered a stroke in 1996 which resulted in dementia.

**B.**   **Procedural History**

Petitioner was convicted of: (1) one count of second degree murder, in violation of California Penal Code § 187; (2) one count of assault with a firearm, in violation of California Penal Code § 245(a)(2); and (3) one count of being an ex-felon in possession of a firearm, in violation of California Penal Code § 12021(c)(1).  With enhancements, petitioner was sentenced to 27 years to life.

Petitioner filed a direct appeal with the California Court of Appeal, which affirmed in a reasoned opinion issued on October 1, 2002, and modified on denial of rehearing on October 30, 2002.  The California Supreme Court denied review without comment.

/ / /

/ / /

/ / /

/ / /

/ / /

## II.  STANDARDS OF REVIEW

Because this action was filed after April 26, 1996, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") are presumptively applicable.  See Lindh v. Murphy, 521 U.S. 320, 336 (1997); Calderon v. United States Dist. Ct. (Beeler), 128 F.3d 1283, 1287 (9th Cir. 1997), cert. denied, 522 U.S. 1099 (1998).  The AEDPA does not, however, apply in all circumstances.  When it is clear that a state court has not reached the merits of a petitioner's claim, because it was not raised in state court or because the court denied it on procedural grounds, the AEDPA deference scheme does not apply and a federal habeas court must review the claim de novo.  See Pirtle v. Morgan, 313 F.3d 1160 (9th Cir. 2002) (holding that the AEDPA did not apply where Washington Supreme Court refused to reach petitioner's claim under its "relitigation rule"); see also Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir. 2002) (holding that, where state court denied petitioner an evidentiary hearing on perjury claim, AEDPA did not apply because evidence of the perjury was adduced only at the evidentiary hearing in federal court); Appel v. Horn, 250 F.3d 203, 210 (3d Cir.2001) (reviewing petition de novo where state court had issued a ruling on the merits of a related claim, but not the claim alleged by petitioner).  When the state court does not reach the merits of a claim, "concerns about comity and federalism . . . do not exist."  Pirtle, 313 F. 3d at 1167.

Where the AEDPA is applicable, federal habeas relief under 28 U.S.C. § 2254(d) is not available for any claim decided on the merits in state court proceedings unless the state court's adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d); see also Penry v. Johnson, 532 U.S. 782, 792-93 (2001); Williams v. Taylor, 529 U.S. 362 (2000); Lockhart v. Terhune, 250 F. 3d 1223, 1229 (9th Cir. 2001).

1              Under § 2254(d), federal habeas relief is available where the state court's decision

2    is "contrary to" or represents an "unreasonable application of" clearly established law.  In

3    Williams v. Taylor, 529 U.S. 362 (2000) (O'Connor, J., concurring, garnering a majority of the

4    Court), the United States Supreme Court explained these different standards.  A state court

5    decision is "contrary to" Supreme Court precedent if it is opposite to that reached by the

6    Supreme Court on the same question of law, or if the state court decides the case differently than

7    the Supreme Court has on a set of materially indistinguishable facts.  See id. at 405.  A state

8    court decision is also "contrary to" established law if it applies a rule which contradicts the

9    governing law set forth in Supreme Court cases.  See id.  In sum, the petitioner must demonstrate

10   that Supreme Court precedent requires a contrary outcome because the state court applied the

11   wrong legal rules.  Thus, a state court decision applying the correct legal rule from Supreme

12   Court cases to the facts of a particular case is not reviewed under the "contrary to" standard.  See

13   id. at 406.  If a state court decision is "contrary to" clearly established law, it is reviewed to

14   determine first whether it resulted in constitutional error.  See Benn v. Lambert, 293 F.3d 1040,

15   1052 n.6 (9th Cir. 2002).  If so, the next question is whether such error was structural, in which

16   case federal habeas relief is warranted.  See id.  If the error was not structural, the final question

17   is whether the error had a substantial and injurious effect on the verdict, or was harmless.  See id.

18             State court decisions are reviewed under the far more deferential "unreasonable

19   application of" standard where it identifies the correct legal rule from Supreme Court cases, but

20   unreasonably applies the rule to the facts of a particular case.  See id.; see also Wiggins v. Smith,

21   123 S.Ct. 252 (2003).  While declining to rule on the issue, the Supreme Court in Williams,

22   suggested that federal habeas relief may be available under this standard where the state court

23   either unreasonably extends a legal principle to a new context where it should not apply, or

24   unreasonably refuses to extend that principle to a new context where it should apply.  See

25   Williams, 529 U.S. at 408-09.  The Supreme Court has, however, made it clear that a state court

26   decision is not an "unreasonable application of" controlling law simply because it is an

                                                    6

1   erroneous or incorrect application of federal law.  See id. at 410; see also Lockyer v. Andrade,

2   123 S.Ct. 1166, 1175 (2003).  An "unreasonable application of" controlling law cannot

3   necessarily be found even where the federal habeas court concludes that the state court decision

4   is clearly erroneous.  See Lockyer, 123 S.Ct. at 1175.  This is because ". . . the gloss of clear

5   error fails to give proper deference to state courts by conflating error (even clear error) with

6   unreasonableness."  Id.  As with state court decisions which are "contrary to" established federal

7   law, where a state court decision is an "unreasonable application of" controlling law, federal

8   habeas relief is nonetheless unavailable if the error was non-structural and harmless.  See Benn,

9   283 F.3d at 1052 n.6.

10          The "unreasonable application of" standard also applies where the state court

11  denies a claim without providing any reasoning whatsoever.  See Himes v. Thompson, 336 F.3d

12  848, 853 (9th Cir. 2003); Delgado v. Lewis, 233 F.3d 976, 982 (9th Cir. 2000).   Such decisions

13  are considered adjudications on the merits and are, therefore, entitled to deference under the

14  AEDPA.  See Green v. Lambert, 288 F.3d 1081 1089 (9th Cir. 2002); Delgado, 233 F.3d at 982.

15  The federal habeas court assumes that state court applied the correct law and analyzes whether

16  the state court's summary denial was based on an objectively unreasonable application of that

17  law.  See Himes, 336 F.3d at 853; Delgado, 233 F.3d at 982.

18

19                          **III.  DISCUSSION**

20          Petitioner raises the following claims in his amended petition: (1) the evidence

21  was insufficient to support petitioner's conviction for second degree murder; (2) the admission

22  of numerous hearsay statements made by Forstein, who did not testify at trial, violated

23  petitioner's right to confront and cross-examine; (3) the trial court erred in admitting edited

24  versions of recorded messages without allowing petitioner to introduce the entire recordings; (4)

25  the trial court erred with respect to jury instructions; (5) ineffective assistance of trial counsel for

26  failing to request certain jury instructions; and (6) jury misconduct.  Respondents concede that

1  these claims are exhausted.

2      **A.**    **Sufficiency of the Evidence**

3          Petitioner argues that the evidence was insufficient to support his conviction for

4  second degree murder on a theory of natural and probable consequences.  When a challenge is

5  brought alleging insufficient evidence, federal habeas corpus relief is available if it is found that,

6  upon the record of evidence adduced at trial, viewed in the light most favorable to the

7  prosecution, no rational trier of fact could have found proof of guilt beyond a reasonable doubt.

8  See Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Under Jackson, the court must review the

9  entire record when the sufficiency of the evidence is challenged on habeas.  See id.  It is the

10  province of the jury to "resolve conflicts in the testimony, to weigh the evidence, and to draw

11  reasonable inferences from basic facts to ultimate facts."  Id.  "The question is not whether we

12  are personally convinced beyond a reasonable doubt.  It is whether rational jurors could reach

13  the conclusion that these jurors reached."  Roehler v. Borg, 945 F.2d 303, 306 (9th Cir. 1991).

14  The federal habeas court determines sufficiency of the evidence in the context of the substantive

15  elements of the criminal offense, as defined by state law.  See Jackson, 443 U.S. at 324 n.16.

16          In rejecting this argument, the California Court of Appeal reasoned:

17          Stringer argues that on the facts of this case, "the killing of
18  Howard Morris cannot, as [a] matter of law, be determined to have been a
    natural and probable consequence of any conduct committed by, agreed
    to, or aided and abetted by [him]."  He insists that "there was no evidence
19  to establish that the shooting of LaMarr's brother under the circumstances
    in which it occurred, was reasonably foreseeable as to [him]."  Thus, due
20  process requires reversal of his conviction.  Based on the standard of
    review applied in challenges to sufficiency of the evidence, we conclude
21  there is substantial evidence that Morris's killing was a natural and
    probable consequence of the assault on LaMarr.
22          Given the content of Forstein's telephone messages, and the fact
    she and Chad stayed with Howard in San Francisco for two days before
23  returning to Sacramento the day of the killing, the jury could reasonably
    infer that Howard knew Forstein's version of the circumstances
24  surrounding her claim LaMarr and his family were bullying Chad.  Chad
    told Howard that Howard Morris, Sr., Morris, and most of the people at
25  Franklin Villa had guns.  The jury could also infer Howard conveyed at
    least some of this information to Stringer while the two men were driving
26  to Sacramento.  In these circumstances, it was not unreasonable for the

8

jury to assume Stringer was aware of the tension between the two families.
This record also supports the inference that a reasonable person in Stringer's position would have or should have known that the killing was a reasonably foreseeable consequence of the assault on LaMarr. [citations omitted].  Howard and Stringer told LaMarr they were police, and threatened him at gunpoint.  Stringer smashed LaMarr's hand against the mailbox, breaking two bones.  In the subsequent call to 911, LaMarr told the dispatcher that his assailants said they were going to get his father and brother.  They jury could infer Howard and Stringer believed the same message would also be conveyed to Morris's family.  Howard prepared for a response.  He left one gun in the bedroom of Forstein's apartment, kept the other gun with him, and went outside.  Forstein, Stringer, and Chad waited inside the apartment.  It was for the jury to decide whether the 20-minute dely in Morris's arrival at the scene broke the causal chain.  On this record, we cannot say as a matter of law that it did.

Because it is clear from the foregoing that the state court applied the correct legal rules, this court must review petitioner's insufficiency of the evidence claim under the more deferential "unreasonable application of" standard.

Under California law, to find a defendant guilty under the natural and probable consequences doctrine, the jury must determine: (1) whether the defendant aided, promoted, encouraged, or instigated the commission of any target crime, with knowledge of the confederate's unlawful purpose, and with the intent of committing, encouraging, or facilitating the commission of the target crime; (2) whether the defendant's confederate committed an offense other than the target crime; and (3) whether the other offense committed by the confederate was a natural and probable consequence of the target crime that the defendant encouraged or facilitated.  See People v. Prettyman, 14 Cal.4th 248, 260 (1996).  Even where the defendant's specific intent only extends to assault with a firearm, a conviction for murder under the natural and probable consequences theory is proper if the murder was foreseeable.  See People v. Bunyard, 45 Cal.3d 1189, 1231-32 (1988).  Finally, it is for the jury – not the court – to determine whether the murder was foreseeable.  See People v. Gardner, 37 Cal.App. 4th 473, 483 (1995).

/ / /

/ / /

1    In light of the foregoing, the question for this court is whether the jury could have

2    reasonably concluded that the murder was foreseeable.  For the same reasons articulated by the

3    state court, this court concludes that a reasonable jury could have made the inferences necessary

4    in this case.  Or, to put it another way, the record does not establish that no rational jury could

5    have concluded the murder was foreseeable.  Therefore, the state court's decision was not an

6    unreasonable application of federal law.

7    In his supplement, addressing the applicability of Juan H. v. Allen, 408 F.3d 1262

8    (9th Cir. 2005), to this case, petitioner argues that "the state court engaged . . . in speculation

9    when it ruled that because Forstein made threatening phone calls to Curtis Howard and because

10   petitioner drove Howard to Sacramento that 'at least some of this information' had been

11   conveyed to petitioner by Howard."  Petitioner concludes, therefore, that the jury could not have

12   reasonably drawn the inference, as described by the state court, that "a reasonable person in

13   Stringer's position would have or should have known that the killing was a reasonably

14   foreseeable consequence of the assault on LaMarr."  In support of his argument, petitioner

15   contends that "there was no evidence to show that petitioner had any kind of relationship to

16   Howard or his family that provided a motive for [petitioner] to become involved in an effort to

17   hurt much less kill. . . ."  Petitioner also asserts that "there was no evidence to indicate that

18   [petitioner] was aware of the tensions between the families or that he was accompanying Howard

19   as anything other than a driver.

20   The court disagrees.  While petitioner is correct that a reasonable inference must

21   be based on a logical connection from one fact to another, petitioner is incorrect in asserting that

22   such a logical chain does not exist in this case.  The question is whether petitioner knew enough

23   about the situation with Forstein and her son to support the conclusion that the murder

24   committed by Howard was a natural and probable consequence of the target crime.  The court

25   finds there is sufficient evidence to establish the logical chain necessary to support the inferences

26   required to conclude that the murder was a natural and probable consequence.  Specifically, the

following facts support the inference:

1.     Forstein said that she was going to "get my fellows to come down here and teach you niggers something;"

2.     Forstein also said, "I'm going to have one-eyed Jimmy come over and kill a bunch of you mothers;"

3.     Forstein said Chad's father [Howard] knew someone named "one-eyed Jimmy," and other "crazy people," who would come to Sacramento and kill for him;

4.     Petitioner is friends with Howard, having worked together in the bail bond business;

5.     Forstein told Howard about the problems at the apartment complex;

6.     Forstein and Chad went to stay with Howard in San Francisco for two days;

7.     Just after this visit, Howard and petitioner returned with Forstein and Chad to Sacramento;

8.     Both Howard and petitioner were armed on this return trip;

9.     Forstein told Finch and her son that she had "her people" with her and that things were going to "come down;"

10.     Both Howard and petitioner confronted LaMarr and pointed their guns at him;

11.     Petitioner smashed LaMarr's hand on the mailbox; and

12.     After this, Howard, Forstein, Chad, and petitioner returned to Forstein's apartment together.

Because both petitioner and Howard were armed on their trip to Sacramento following Forstein's visit, it is reasonable to infer that they were both returning for the same reason – to "take care" of LaMarr and his mother. Supporting this inference is the fact that, upon arriving at the apartment complex in Sacramento, both Howard and petitioner actually drew their guns on LaMarr. In addition, petitioner smashed LaMarr's hand. Finally, petitioner, Howard, Forstein, and Chad all returned to the same apartment (Forstein's) after this confrontation. It is clear from all this that petitioner was far more than simply Howard's driver. If he were just a driver, he would not have also brought a gun, drew it on LaMarr, or smashed LaMarr's hand. Moreover, Forstein would

not have referred to "her people" – an obvious reference to more than one person – if only

Howard was going to make things "come down."  In sum, the court concludes that a reasonable

jury could infer from these facts that petitioner was brought along as Howard's "muscle" and

that petitioner intended to fulfill that role.

**B.   Admission of Hearsay**

Petitioner argues that hearsay evidence was improperly admitted.  In particular,

petitioner complains about out-of-court statements made by Forstein in the form of phone

messages she left on Howard's answering machine and statements she made to family and

friends.  The state court offered the following description of the hearsay at issue:

> Forstein's statements were a major focus of pretrial motions.  They
> included: (1) messages left by Forstein on Howard's telephone recorder on
> September 7, 8, and 9, 1999; (2) statements made in the presence of Dean
> Madeiros and Frank Munoz on how Forstein planned to deal with
> problems in her neighborhood, which were admitted only as to Forstein;
> (3) statements made by Forstein to people in her neighborhood before
> September 20, 1999; (4) statements made by Forstein before and during
> the September 20, 1999, confrontation with LaMarr and his mother,
> Wanda Frazier; (5) statements made by Forstein in a September 20, 1999,
> telephone conversation overheard by Keith Hodges; and (6) statements
> made by Forstein to the Finches just before the shooting.
>     The court heard argument and reviewed the proffered evidence
> over a period of four days.  It ruled that many of Forstein's statements
> were "relevant and admissible for purposes of arguing the existence of the
> conspiracy, the defendant Forstein's intention to put others together with
> her to accomplish a conspiracy, and it explains then arguably why
> defendant Stringer acted the way he did on that date."  Some of the
> statements were admissible under the [California] Evidence Code section
> 1250 exception to the hearsay rule as evidence of "state of mind, future
> intent, plan, motive, et cetera, to arguably prove . . . conduct."  The court
> admitted other statements as declarations of a party under [California]
> Evidence Code section 1220.  As to the taped telephone messages, the
> court admitted only part of what was offered by the prosecution, ruling
> that ". . . the portions that reflect Forstein's animosity towards the victims
> are relevant and otherwise admissible, . . .  The portions that belittle
> defendant Howard for not protecting the son and causing the son to be in
> danger are relevant and admissible at least where that's all she states
> within the sequence.  . . .  The portions that accuse defendant Howard of
> other wrongdoing are not admissible and are not relevant, and even if they
> were arguably relevant, [it] would exclude them under [California]
> Evidence Code section 352. . . ."

///

1    The Confrontation Clause protects a defendant from unreliable hearsay evidence

2  being presented against him during trial.  See U.S. Constitution, Amendment VI.  Prior to the

3  Supreme Court's decision in Crawford v. Washington, 541 U.S. 36 (2004), the admission of

4  hearsay evidence did not violate the Confrontation Clause where the hearsay fell within a firmly

5  rooted exception to the hearsay rule or otherwise contained "particularized guarantees of

6  trustworthiness." Lilly v. Virginia, 527 U.S. 116, 123-24 (1999); Ohio v. Roberts, 448 U.S. 56,

7  66 (1980).  In Crawford, however, the Supreme Court announced a new rule:  Out-of-court

8  statements by witnesses not appearing at trial that are testimonial are barred under the

9  Confrontation Clause unless the witnesses are unavailable and the defendant had a chance to

10  cross-examine, regardless of whether such statements are deemed reliable by the trial court.  See

11  541 U.S. at 51.  If error occurred, the next question is whether such error was harmless.

12  See Bockting, 399 F.3d at 1022 (applying harmless error analysis).

13    While the Supreme Court in Crawford "left for another day any effort to spell out

14  a comprehensive definition of 'testimonial,'" the Court provided some guidance. 541 U.S. at 68.

15  The Court observed that "[a]n accuser who makes a formal statement to government officers

16  bears testimony in a sense that a person who makes a casual remark to an acquaintance does

17  not." Id. at 51; see also Davis v. Washington, ___U.S.___, 126 S.Ct. 2266 (2006) (holding that

18  law enforcement interrogations directed at establishing the facts of a past crime or in order to

19  identify the perpetrator are testimonial).

20    The Ninth Circuit held in Bockting v. Bayer that the Crawford rule should be

21  applied retroactively on collateral review.  See 399 F.3d 1010, as amended on denial of rehearing

22  by 408 F.3d 1127 (9th Cir. 2005).  Specifically, the court held that retroactive application of

23  Crawford does not violate the non-retroactivity principle set forth in Teague v. Lane, 489 U.S.

24  / / /

25  / / /

26  / / /

13

288 (1989).[3]  However, on February 28, 2007, the United States Supreme Court announced its decision in <u>Whorton v. Bockting</u>, ___ U.S. ___ (Feb. 28, 2007), reversing the Ninth Circuit's holding.  The Supreme Court concluded that <u>Crawford</u> does not apply retroactively to cases on collateral review.

As to the challenged hearsay, the state court held:

> We conclude the court did not abuse its discretion in admitting Forstein's out-of-court statements as evidence against Howard and Stringer.  The court properly ruled that the challenged statements came within the . . . .state of mind exception to the hearsay rule, and therefore posed no confrontation problem.

As to relevance, the court stated:

> The first question was whether the proffered statements were relevant. . . . [¶] The court did not abuse its discretion in ruling that Forstein's statements were relevant.  The taped telephone messages demonstrated Forstein's fear for Chad's safety, animosity toward the victims, and efforts to goad Howard into giving her money to move – all tending to establish a motive for later conspiring to injure or kill LaMarr and his family.  Forstein's subsequent statements were relevant as evidence of her plan to bring Howard and others from San Francisco to kill the Morrises.  The conversation overheard by Hodges identified the time Forstein brought Howard into the plan.  The existence of the plan to harm the Morris family was also relevant to Stringer's liability as an aider and abettor.  Thereafter, a jury could find Stringer knew about the criminal enterprise, drove Howard back to Sacramento, knew Howard took guns with him, and joined Howard in confronting LaMarr upon their arrival at Franklin Villa.

/ / /

/ / /

/ / /

---

[3]      In <u>Teague v. Lane</u>, the Supreme Court held that new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced unless they fall within two exceptions to the general rule.  <u>See</u> 489 U.S. 288 (1989).  The two exceptions are if the new constitutional rule of criminal procedure would "place certain kinds of primary, private individual conduct beyond the power of criminal-law making authority..." or "require the observance of 'those procedures that...are 'implicit in the concept of ordered liberty.'"  <u>Id.</u> at 307; <u>see also</u>, <u>Sawyer v. Smith</u>, 497 U.S. 227, 242 (1990).  In <u>Bockting</u>, the Ninth Circuit held that <u>Crawford</u> applied retroactively because it altered the understanding of the bedrock procedural elements essential to the fairness of a proceeding. <u>See</u> 399 F.3d at 1019-20.

1   As to petitioner's argument that admission of the hearsay violated his right to confront witnesses

2   against him, the state court said:

3           The second question was whether Forstein's relevant out-of-court
        statements were admissible against Howard and Stinger without violating
4       their right to confrontation. "'The central concern of the Confrontation
        Clause is to ensure the reliability of the evidence against a criminal
5       defendant by subjecting it to rigorous testing in the context of an
        adversary proceeding before the trier of fact.' [Citation.]" Lilly v.
6       Virginia, 527 U.S. 116, 123-24 (1999). "[T]he veracity of hearsay
        statements is sufficiently dependable to allow the untested admission of
7       such statements against an accused when (1) 'the evidence falls within a
        firmly rooted hearsay exception' or (2) it contains "particularized
8       guarantees of trustworthiness' such that adversarial testing would be
        expected to add little, if anything, to the statements' reliability." Lilly,
9       supra, at 124-25. . . .

10

11  The state court continued with an analysis of the state of mind exception to the hearsay rule:

12          The [California] Evidence Code section 1250 state of mind
        exception to the hearsay rule is firmly rooted in California's decision and
13      statutory law. (citations omitted). Included within this hearsay exception
        are statements offered to show the declarant's intent to do a future act,
14      such as draw others into a plot to rob a restaurant or to commit murder.
        (citations omitted). Statements within this exception are admissible
15      against confederates as well as declarants. (citations omitted). [¶] We
        independently review the trial court's ruling on this "fact-intensive, mixed
16      question of constitutional law," Lilly, supra, and conclude it properly
        found that Forstein's statements fell within the . . . state of mind exception
17      to the hearsay rule. The taped telephone messages showed Forstein's fear
        of her neighbors, concern for Chad's safety, and anger at Howard for not
18      paying her the money she said he owed. The remaining statements reveal
        Forstein's intent to bring Howard and his confederates from San Francisco
19      to kill LaMarr and his family. Her warning to the Finches show
        knowledge of what was about to happen.

20  Because the state court applied the Lilly/Ohio test, which was the correct test at the time, this

21  court must review the state court's determination under the deferential "unreasonable application

22  of" standard.

23          Under California Evidence Code § 1250, statements concerning the declarant's

24  "then existing state of mind, emotion, or physical sensation (including a statement of intent, plan,

25  motive, design mental feeling, pain, or bodily health) is not made inadmissible by the hearsay

26  rule when" (1) the evidence is offered to prove the declarant's state of mind, emotion, or

                                            15

1    physical sensation at that time or at any other time when it is itself an issue in the action; or

2    (2) the evidence is offered to prove or explain acts or conduct of the declarant."[4]  This exception

3    is subject to a limitation under California Evidence Code § 1252 if the "statement was made

4    under circumstances such as to indicate its lack of trustworthiness."

5             If Forstein's out-of-court statements fall under § 1250's hearsay exception, or if

6    they are otherwise reliable, then the state court's rejection of petitioner's Confrontation Clause

7    claim was not an unreasonable application of established Supreme Court precedent.  See Lilly,

8    527 U.S. at 123-24; Ohio, 448 U.S. at 66.  Under California law, for statements to fall under

9    § 1250, they must be offered for the specific purposes described in § 1250 and they must be

10   reliable.  Thus, if the hearsay falls under § 1250, both of the conditions outlined by the Supreme

11   Court for acceptable admission of hearsay are met.

12             The record reflects that Forstein made the following out-of-court statements:

13   1.    Forstein told her mechanic, Dean Madeiros, and her employer, Frank
            Munoz, that she would bring in some muscle to deal with the
14          neighborhood problems and that her "ex" was a bail bondsman who lived
            in San Francisco;

15
     2.    Forstein had confrontations with Wanda Frazier, LaMarr's mother and,
16          after one incident, Forstein said she was going to "get one-eyed Jimmy
            and come back and kill" Frazier's children;

17
     3.    On September 7, 8, and 9, 1999, Forstein left telephone messages for
18          Curtis Howard explaining that Chad was in danger;.

19   4.    Forstein told LaMarr that Chad's father knew someone named "one-eyed
            Jimmy," and other "crazy people," who would come to Sacramento and
20          kill for him;

21   5.    Keith Hodges overheard part of a telephone conversation in which
            Forstein told Howard: "I got a job for you, come here as soon as possible,
22          I need you to get rid of these two black niggers . . .;"

23   ///

24   ///

25   ──────────────────────
           [4]       It is undisputed that the state of mind exception to the hearsay rule is firmly
26   rooted.

6.      Robert Price, the security guard, overheard Forstein tell Howard Morris, Sr.: "[T]hat's okay, I get my fellows to come down here and teach you niggers something" and "I'm going to have one-eyed Jimmy come over and kill a bunch of you mothers;" and

7.      Forstein warned Finch and her son Donny that she had her people with her and things were going to "come down."

Because "muscle" would not be required for any lawful approach to the neighborhood situation, these statements go to the existence of intent, plan, motive, and design to form a conspiracy with her "ex" and "some muscle" to use deadly force.  See Cal. Evid. Code § 1250(a).  The statements also tend to prove or explain Forstein's later conduct of actually arranging for Howard and petitioner to come with her from San Francisco.  See Cal. Evid. Code § 1250(a)(2).

The last requirement for statements to be admissible under the § 1250 hearsay exception is that they must be reliable.  As to reliability, the state court concluded:

> The sheer volume and consistency of Forstein's statements argue in favor of trustworthiness.  She repeatedly expressed fear for Chad's safety, anger at Wanda Frazier and her family for bullying Chad, frustration at Howard's failure to protect his son from danger, and the intent to do something about the problem.  The threats recounted by neighbors and coworkers before September 20, 1999, may have included an element of "puffing" that she knew tough guys in San Francisco.  However, Forstein's statements in the September 20 argument with LaMarr and his mother, and the subsequent phone call to Howard, clearly expressed the anger and fear of the moment.

This court cannot say that the state court's analysis resulted in an unreasonable application of federal law.  In particular, each of the out-of-court statements identified above relates to the same thing – a conspiracy to use deadly force.  Forstein told Howard of her fear that Chad was in danger.  Forstein consistently referred to individuals whom she could arrange to come to the Franklin Villa apartment complex.  This is not the case of a one-time statement which could have been taken out of context or misunderstood and, therefore, would not be reliable.  Rather, Forstein's statements were consistent in their content and were repeated on several occasions to several people.

/ / /

1    Because the statements were properly admitted under § 1250, which contains a

2    requirement that the statements be reliable, the state court's adjudication of this claim did not

3    result in an unreasonable application of clearly established federal law at the time.

4           C.      **Admission of Edited Tape Recordings**

5           Petitioner claims that the trial court erred by admitting edited versions of tape

6    recorded phone messages Forstein left on Howard's answering machine.  Petitioner asserts that

7    the entire tape recordings should have been presented to the jury in order to present a complete

8    picture of Forstein's state of mind.  A writ of habeas corpus is available under 28 U.S.C. § 2254

9    only on the basis of a transgression of federal law binding on the state courts.  See Middleton v.

10   Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir.

11   1983).  It is not available for alleged error in the interpretation or application of state law.

12   Middleton, 768 F.2d at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987);

13   Givens v. Housewright, 786 F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be utilized

14   to try state issues de novo.  See Milton v. Wainwright, 407 U.S. 371, 377 (1972).

15          However, a "claim of error based upon a right not specifically guaranteed by the

16   Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so

17   infects the entire trial that the resulting conviction violates the defendant's right to due process."

18   Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th

19   Cir. 1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941).  Because federal habeas

20   relief does not lie for state law errors, a state court's evidentiary ruling is grounds for federal

21   habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due

22   process.  See Drayden v. White, 232 F.3d 704, 710 (9th Cir. 2000); Spivey v. Rocha, 194 F.3d

23   971, 977-78 (9th Cir. 1999); Jammal v. Van de Kamp, 926 F.2d 918, 919 (9th Cir. 1991); see

24   also Hamilton v. Vasquez, 17 F.3d 1149, 1159 (9th Cir. 1994).   In order to raise such a claim in

25   a federal habeas corpus petition, the "error alleged must have resulted in a complete miscarriage

26   of justice."  Hill v. United States, 368 U.S. 424, 428 (1962); Crisafi v. Oliver, 396 F.2d 293, 294-

1  95 (9th Cir. 1968); Chavez v. Dickson, 280 F.2d 727, 736 (9th Cir. 1960).

2        To prevail, petitioner must demonstrate that admission of the edited tape

3  recordings, as opposed to the complete records, rendered his trial fundamentally unfair.

4  Petitioner argues that the ruling was fundamentally unfair because it precluded him from

5  presenting a defense by preventing the jury from seeing relevant defense evidence (i.e., the full

6  recordings).   Specifically, petitioner claims that, had the jury heard the entire tape recordings,

7  they would have concluded that they were the desperate rantings of an out-of-control woman.

8  However, the court cannot say that admission of the edited tapes resulted in a complete

9  miscarriage of justice.  Even if the jury believed that Forstein was ranting and out of control,

10 they could also reasonably have concluded that she solicited Howard as "muscle."  One does not

11 necessarily exclude the other.

12     **D.**    <u>**Jury Instructions**</u>

13       Petitioner raises five claims relating to jury instructions.  First, he argues that the

14 trial court erred in modifying CALJIC No. 6.24.  Second, petitioner argues that the trial court

15 erred in modifying CALJIC No. 6.10.5.  Third, petitioner argues that the court failed to instruct

16 the jury under CALJIC No. 6.21.  Fourth, petitioner contends that the trial court failed to instruct

17 the jury under CALJIC No. 6.16.   Finally, petitioner claims that the trial court erred with respect

18 to the self-defense instructions.

19       A writ of habeas corpus is available under 28 U.S.C. § 2254 only on the basis of a

20 transgression of federal law binding on the state courts.  See Middleton v. Cupp, 768 F.2d 1083,

21 1085 (9th Cir. 1985); Gutierrez v. Griggs, 695 F.2d 1195, 1197 (9th Cir. 1983).  It is not

22 available for alleged error in the interpretation or application of state law.  Middleton, 768 F.2d

23 at 1085; see also Lincoln v. Sunn, 807 F.2d 805, 814 (9th Cir. 1987); Givens v. Housewright,

24 786 F.2d 1378, 1381 (9th Cir. 1986).  Habeas corpus cannot be utilized to try state issues de

25 novo.  See Milton v. Wainwright, 407 U.S. 371, 377 (1972).  Thus, a challenge to jury

26 instructions does not generally give rise to a federal constitutional claim.  See Middleton, 768

1   F.2d at 1085) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).

2          However, a "claim of error based upon a right not specifically guaranteed by the

3   Constitution may nonetheless form a ground for federal habeas corpus relief where its impact so

4   infects the entire trial that the resulting conviction violates the defendant's right to due process."

5   Hines v. Enomoto, 658 F.2d 667, 673 (9th Cir. 1981) (citing Quigg v. Crist, 616 F.2d 1107 (9th

6   Cir. 1980)); see also Lisenba v. California, 314 U.S. 219, 236 (1941).  In order to raise such a

7   claim in a federal habeas corpus petition, the "error alleged must have resulted in a complete

8   miscarriage of justice."  Hill v. United States, 368 U.S. 424, 428 (1962); Crisafi v. Oliver, 396

9   F.2d 293, 294-95 (9th Cir. 1968); Chavez v. Dickson, 280 F.2d 727, 736 (9th Cir. 1960).

10          In general, to warrant federal habeas relief, a challenged jury instruction "cannot

11   be merely 'undesirable, erroneous, or even "universally condemned,"' but must violate some due

12   process right guaranteed by the fourteenth amendment."  Prantil v. California, 843 F.2d 314, 317

13   (9th Cir. 1988) (quoting Cupp v. Naughten, 414 U.S. 141, 146 (1973)).  To prevail, petitioner

14   must demonstrate that an erroneous instruction "'so infected the entire trial that the resulting

15   conviction violates due process.'"  Estelle v. McGuire, 502 U.S. 62, 72 (1991) (quoting Cupp,

16   414 U.S. at 147).  In making its determination, this court must evaluate the challenged jury

17   instructions "'in the context of the overall charge to the jury as a component of the entire trial

18   process.'"  Prantil, 843 F.2d at 817 (quoting Bashor v. Risley, 730 F.2d 1228, 1239 (9th Cir.

19   1984)).  Further, in reviewing an allegedly ambiguous instruction, the court "must inquire

20   'whether there is a reasonable likelihood that the jury has applied the challenged instruction in a

21   way' that violates the Constitution."  Estelle, 502 U.S. at 72 (quoting Boyde v. California, 494

22   U.S. 370, 380 (1990)).  Petitioner's burden is "especially heavy" when the court fails to give an

23   instruction.  Henderson v. Kibbe, 431 U.S. 145, 155 (1977).

24   / / /

25   / / /

26   / / /

It is well-established that the burden is on the prosecution to prove each and every element of the crime charged beyond a reasonable doubt.  See In re Winship, 397 U.S. 358, 364 (1970).  Therefore, due process is violated by jury instructions which use mandatory presumptions to relieve the prosecution's burden of proof on any element of the crime charged. See Francis v. Franklin, 471 U.S. 307, 314 (1985); see also Sandstrom v. Montana, 442 U.S. 510 (1979).  A mandatory presumption is one that instructs the jury that it must infer the presumed fact if certain predicate facts are proved.  See Francis, 471 U.S. at 314.  On the other hand, a permissive presumption allows, but does not require, the trier of fact to infer an elemental fact from proof of a basic fact.  See County Court of Ulster County v. Allen, 442 U.S. 140, 157 (1979).  The ultimate test of the constitutionality of any presumption remains constant – the instruction must not undermine the factfinder's responsibility at trial, based on evidence adduced by the government, to find the ultimate facts beyond a reasonable doubt.  See id. at 156 (citing In re Winship, 397 U.S. at 364).

                1.    Modification of CALJIC No. 6.24

CALJIC No. 6.24 reads:

> Evidence of a statement made by one alleged conspirator other than at this trial shall not be considered by you as against another alleged conspirator unless you determine:
>
>     1.    That from other independent evidence that at the time the statement was made a conspiracy to commit a crime existed;
>
>     2.    That the statement was made while the person making the statement was participating in the conspiracy and that the person against whom it was offered was participating in the conspiracy before or during that time; and
>
>     3.    That the statement was made in furtherance of the objective of the conspiracy.
>
> The word "statement" as used in this instruction includes any oral or written verbal expression or the nonverbal conduct of a person intended by that person as a substitute for oral or written verbal expression.

The trial court modified this instruction by adding the following language:

> However, statements of intent to do a future act may be considered for any purpose or against any defendant.

1  Petitioner argues that this modification improperly allowed all of Forstein's out-of-court

2  statements to be admitted and concludes, therefore, that the modification violated his right to

3  confront witnesses against him.  The court finds no constitutional error because, as discussed

4  above, none of Forstein's out-of-court statements were testimonial in nature.  Therefore, the

5  Confrontation Clause could not have been offended by admission of any of her statements.  For

6  this reason, the modification of CALJIC No. 6.24 could not have resulted in violation of

7  petitioner's rights under the Confrontation Clause.

8               2.      Modification of CALJIC No. 6.10.5

9        Petitioner claims that the trial court erroneously modified CALJIC No. 6.10.5 in

10  such a way that the target crime was left to the jury's imagination, thereby reducing the

11  prosecution's burden on the conspiracy charge.  As to CALJIC No. 6.10.5, the state court said:

12            In Prettyman, 14 Cal.4th at 267-68, the Supreme Court held that
       instructions on aiding and abetting must identify the target crime or crimes
13     the defendant is alleged to have assisted or encouraged to assist the jury in
       determining whether the crime charged was a natural and probable
14     consequence of some other criminal act.  Where the natural and probable
       consequences doctrine applies, "a conviction may not be based on the
15     jury's generalized belief that the defendant intended to assist and/or
       encourage unspecified 'nefarious' conduct."  The Court acknowledged
16     that the natural and probable consequences doctrine applies equally to
       aiders and abettors and conspirators.
17            Here, the court identified the target crime as that "committed
       against LaMarr Morris" in its instructions on aiding and abetting.  The
18     instructions also informed the jury that Stringer and Howard were charged
       in count two with assault with a firearm . . ., which included the lesser
19     crime of battery. . . .  The court identified LaMarr as the victim in count
       two on at least two occasions.  Stringer's counsel acknowledged in closing
20     argument that with respect to the aiding and abetting instructions, "there's
       only two crimes that are defined for you.  One is the . . . assault with a
21     deadly weapon, and the other is a battery."
              With respect to conspiracy, the court modified CALJIC No. 6.10.5
22     . . . which read: "A conspiracy is an agreement between two or more
       persons with the specific intent to commit the crime of _____,
23     and with the further specific intent to commit that crime, . . ."  Instead, it
       instructed the jury that "a conspiracy is an agreement between two or
24     more persons with the specific intent to agree to commit a crime and with
       the further specific intent to commit that crime." (emphasis added in
25     original).

26  / / /

Stringer maintains the modified version of CALJIC No. 6.10.5 failed to satisfy the <u>Prettyman</u> standard.  The instruction "provided no guidance to the jury about what the object of this alleged agreement among the defendants might have been."  He contends the instruction was erroneous "because it left the imagined target to the jury's imagination, and the other instructions did not correct the possibility that the jury would rely on noncriminal conduct."

We emphasize once again that instructional error """"cannot be predicated upon an isolated phrase, sentence or excerpt taken from the instructions . . . since, in order to determine the correctness . . . in their relations to and with each other and in the light of the instructions as a whole and whether a jury has been correctly instructed is not to be determined from a consideration of a part of an instruction or one particular instruction, but from the entire charge of the court."""" (citations omitted).  The instructions on aiding and abetting and the charges in count two informed the jury of the target crimes.  The court identified LaMarr as the victim in count two, and in no other count.  Indeed, the jury convicted Stringer of assault with a firearm in count two, and could not have mistaken the relationship between that finding and application of the natural and probable consequences doctrine.  Accordingly, we conclude that the instructions adequately informed the jury of the target crimes.

As the state court reasoned, other instructions and the charges themselves made it clear to the jury that the target crimes were assault with a deadly weapon or the lesser offense of battery.  Moreover, it was clear to the jury that LaMarr was the victim of the target offense.  Therefore, contrary to petitioner's assertion, these items were not left to the jury's imagination.

### 3. Failure to Instruct Under CALJIC No. 6.21

Petitioner asserts that the trial court failed to instruct the jury on when the conspiracy ended and argues that this deprived him of his defense that the conspiracy ended "at the time LaMarr was sent back inside after his encounter with petitioner and Howard."  With respect to CALJIC No. 6.21, the state court concluded:

Under well-established law, a conspiracy "usually comes to an end when the substantive crime for which the coconspirators are being tried is either attained or defeated. [Citations.] It is for the trier of fact – considering the unique circumstances and the nature and purpose of the conspiracy of each case – to determine precisely when the conspiracy has ended [Citations.]" (citations omitted).

"A criminal defendant is entitled, on request, to a[n] instruction 'pinpointing' the theory of his defense." (citations omitted).  As a defense to criminal liability under the prosecution's conspiracy theory, Stringer argued that if there was a conspiracy at all, it ended after the assault on LaMarr.  He was playing video games with Chad at the time of Howard's

encounter with Morris.  Stringer argues on appeal that he was denied effective assistance of counsel because his trial attorney failed to request CALJIC No. 6.21.  That instruction reads: "No act or declaration of a conspirator committed or made after the conspiracy has been terminated is binding upon co-conspirators, and they are not criminally liable for any such act."

We conclude other instructions adequately covered the principles set forth in CALJIC No. 6.21.  These include CALJIC Nos. 6.16, 6.17, 6.19, and 6.20.  Accordingly, Stringer suffered no prejudice from his counsel's failure to request CALJIC No. 6.21.

While petitioner's federal claim is not couched in terms of ineffective assistance of counsel, the state court's reasoning is equally applicable.  Specifically, this court agrees with the state court that other jury instructions pinpointed petitioner's defense theory regarding liability for acts occurring after the conspiracy ended.  The record reflects that the trial court instructed the jury, in relevant part, as follows:

A member of a conspiracy is liable for the acts and declarations of his or her co-conspirators until he or she effectively withdraws from the conspiracy or the conspiracy has terminated.

This is the converse of the instruction petitioner contends should have been read and conveys the same law – a conspirator is not liable for the acts of co-conspirators taken after the conspiracy has terminated.  Therefore, there is no merit to this claim.

4.     Failure to Instruct Under CALJIC No. 6.16

Petitioner asserts that the trial court erred by failing to instruct under CALJIC No. 6.16, which reads:

Where a conspirator commits an act or makes a declaration which is neither in furtherance of the object of the conspiracy nor the natural and probable consequence of an attempt to attain that object, [he][she] alone is responsible for and is bound by that act or declaration, and no criminal responsibility therefor attaches to any of [his][her] confederates.

As respondents note, however, this instruction was in fact given.

/ / /

/ / /

/ / /

24

1          5.      Self-Defense Instruction

2          Finally, petitioner claims that the trial court's self-defense instructions essentially

3   created strict liability.  The trial court instructed the jury under CALJIC Nos. 5.54 and 5.55,

4   which read:

5          The right of self-defense is only available to a person who initiated
           an assault if he has done all the following:
6               1.      He has actually tried in good faith to refuse to continue
           fighting;
7               2.      He has clearly informed his opponent that he wants to stop
           fighting; and
8               3.      He has clearly informed his opponent that he has stopped
           fighting.

9
           The right of self-defense is not available to a person who seeks a
10  quarrel with the intent to create a real or apparent necessity of exercising
           self-defense.

11

12  The state court addressed this claim as follows:

13         Counsel for Stringer . . . asked the court to remove CALJIC No.
    5.54, self-defense by an aggressor, from the packet of written instructions
14  given to the jury, and inform the jury that it did not apply to the facts of
    the case.  The prosecution argued the instruction was appropriate because
15  there was evidence Howard was the aggressor.  "[Howard's] the one that
    pulled out a gun, not the victim.  The victim is just walking across the
16  street."  The court declined to withdraw CALJIC No. 5.54, acknowledging
    the possibility the jury could find that Howard was the aggressor.
17         On appeal, Stringer argues that the court erred in reading CALJIC
    Nos. 5.54 and 5.55 "because Curtis Howard was not the aggressor in the
18  contact with Howard Morris.  These instructions improperly restricted
    defendant Howard's right of self-defense and thus his murder conviction
19  cannot stand.  Because [Stringer's] liability is derivative of Howard's,
    [his] conviction must also be reversed."  He says the error was
20  exacerbated by the prosecution argument that self-defense was not
    available to Howard because of the earlier confrontation with LaMarr.
21         The principal difficulty with Stringer's argument is that there was
    conflicting evidence regarding the respective roles played by Howard and
22  Morris in the confrontation that resulted in Morris's death.  Contrary to
    Stringer's contentions, the earlier assault on LaMarr was relevant to
23  Howard's claim of self-defense, and the level of his criminal liability for
    the killing.  There is evidence Morris was in a rage when he heard what
24  had happened to LaMarr.  He grabbed a baseball bat, climbed through the
    window of his home, and went to Shirley Hamilton's to call his mother.
25  Morris had calmed down a bit when he took off his shirt, started across the
    alley, and said in a loud voice, "shouldn't be F'ing with my family."  One
26  witness heard Morris yell for Chad to come out with his dog and

                                        25

nunchaks.  At the same time, the witnesses generally agreed Morris was unarmed when he approached Howard.  Indeed, Howard himself testified he saw nothing in Morris's hands.  When Morris got close to Howard, the older man pulled out a gun and shot him.

There was also conflicting evidence on the question whether, as argued by Stringer, there was a "complete break in the chain of events" – that is, between the assault on LaMarr and the killing of Morris.  As we explained, it was for the jury to decide whether "a particular criminal act was a natural and probable consequence of another criminal act aided and abetted by a defendant . . . ."

On this record, we cannot say that the challenged self-defense instructions did not apply as a matter of law.  It was left to the jury to decide what happened, and to apply CALJIC Nos. 5.54 and 5.55 if appropriate to the facts of the case.

As the state court observed, petitioner's claim arises from the incorrect characterization of the facts as being conclusive as a matter of law that Howard was not the aggressor and that Morris was.  This is not the case.  While the witnesses tended to agree that Morris did not have anything in his hands as he approached Howard, other witnesses said he had grabbed a baseball bat.  It was for the jury to decide who was the aggressor and to apply the instructions based on that factual finding.  The instructions did not mislead the jurors into believing that they had to conclude any particular person was the aggressor.  This court, therefore, cannot say that the state court's decision was either "contrary to" or an "unreasonable application of" federal law.

###   E.   Ineffective Assistance of Counsel

Petitioner argues that his trial counsel was ineffective for failing to request instructions under CALJIC Nos. 6.16 and 6.21.  The Sixth Amendment guarantees the effective assistance of counsel.  The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984).  First, a petitioner must show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  See id. at 688.  To this end, petitioner must identify the acts or omissions that are alleged not to have been the result of reasonable professional judgment.  See id. at 690.  The federal court must then determine whether, in light of all the

1  circumstances, the identified acts or omissions were outside the wide range of professional

2  competent assistance.  See id.   In making this determination, however, there is a strong

3  presumption "that counsel's conduct was within the wide range of reasonable assistance, and that

4  he exercised acceptable professional judgment in all significant decisions made." Hughes v.

5  Borg, 898 F.2d 695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).

6          Second, a petitioner must affirmatively prove prejudice.  See Strickland, 466 U.S.

7  at 693.  Prejudice is found where "there is a reasonable probability that, but for counsel's

8  unprofessional errors, the result of the proceeding would have been different." Id. at 694.  A

9  reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.;

10 see also Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not

11 determine whether counsel's performance was deficient before examining the prejudice suffered

12 by the defendant as a result of the alleged deficiencies . . . If it is easier to dispose of an

13 ineffectiveness claim [for] lack of sufficient prejudice . . . that course should be followed."

14 Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).

15         As to CALJIC No. 6.16, this instruction was given.   As to CALJIC No. 6.21, for

16 the reasons discussed above, the court concludes that the trial court's other instructions conveyed

17 the same legal concept.  Therefore, petitioner was not prejudice by counsel's failure to request

18 either instruction.

19     **F.      Jury Misconduct**

20         Finally, petitioner claims jury misconduct.  The state court provided the following

21 background:

22         Here, the claims of misconduct arose on the tenth day of trial, when
           the bailiff informed the court that three female jurors felt uncomfortable
23         because of the way Stringer was looking at them.  The court and counsel
           discussed the matter the following morning outside the presence of the
24         jury.  Forstein's counsel moved to exclude Juror Nos. 4 and 5, and alternate
           No. 3 for cause.
25         Questioning of the three jurors by the court and counsel revealed
           that the women were bothered by Stringer's attempt to make eye contact
26         with them, and by his body language in response to witness testimony.

27

Juror No. 4 had noticed the problem the week before.  All three admitted speaking with each other before they approached the bailiff with their concerns.  They also questioned Juror No. 11.  Juror Nos. 4 and 5, and alternate No. 3 stated they could remain objective about the facts of the case as long as the court was aware of Stringer's conduct, and something was done to stop it.  Juror No. 11 said she mentioned eye contact with a defendant to Juror No. 4.  She told the court the eye contact was with Forstein.  However, Juror No. 11 told the court that the incident caused her no concern.  She had not heard any juror other than Juror No. 4 mention the issue.

The state court then addressed petitioner's argument:

On appeal, Forstein and Stringer contend the court erred in ruling there was no jury misconduct and no further action was warranted.  They argue the court should have replaced three of the jurors because the reactions they reported amounted to information outside the record that affected their ability to be impartial.  Forstein and Stringer also maintain the court abused its discretion in failing to question all the jurors after four jurors admitted that they had discussed their observations and reactions with each other.

. . . We conclude the record supports the court's finding there was no misconduct, and the court did not abuse its discretion in denying the motions to excuse specific jurors, for mistrial, and for new trial.

* * *

Here, the court emphasized that the discussion among the jurors did not involve "any of the facts, testimony and issues of the trial other than their uncomfortable feeling and reaction to a defendant's conduct and what to do about it."  Moreover, Juror Nos. 4 and 5, and alternate Juror No. 3 assured the court that Stringer's and Forstein's attempts to make eye contact would not affect their ability to judge defendants fairly, as long as the conduct stopped.  Juror No. 11 said the incident caused her no concern.  There is no evidence the defendants continued their efforts to make eye contact with jurors after the conduct was brought to the court's attention.

. . . After questioning Juror Nos. 4, 5, and 11, and alternate No. 3, the court was satisfied they could continue to be fair and objective.

The Sixth Amendment guarantees a fair trial by an impartial jury.  See Irvin v. Dowd, 366 U.S. 717, 722 (1961); Tinsley v. Borg, 895 F.2d 520, 523 (9th Cir.1990).  If even a single juror is "unduly biased or prejudiced" the defendant has been denied his right to an impartial jury.  See Tinsley, 895 F.2d at 523-24.  To establish misconduct in the context of failing to answer voir dire questions, petitioner must demonstrate that the juror failed to answer honestly, and that a correct response would have provided a basis for a challenge for cause. See

1  id. at 524.

2       However, not every incident of juror misconduct or bias requires a new trial. See

3  United States v. Klee, 494 F.2d 394, 396 (9th Cir. 1974). "The test is whether or not the

4  misconduct has prejudiced the defendant to the extent that he has not received a fair trial." Id.

5  On collateral review, if misconduct occurred, a petitioner must show that the alleged error "'had

6  substantial and injurious effect or influence in determining the jury's verdict.'" Jeffries v.

7  Blodgett, 5 F.3d 1180, 1190 (9th Cir. 1993) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637

8  (1993)); see also Hughes v. Borg, 898 F.2d 695, 699 (1990).

9       In this case, petitioner cannot establish the requisite bias or prejudice. All the

10  jurors in question specifically stated that they could remain fair and objective as long as

11  petitioner's conduct stopped, which it did. Therefore, the state court's adjudication of this claim

12  was neither "contrary to" or an "unreasonable application of" federal law.

13  **IV. CONCLUSION**

14       Based on the foregoing, the undersigned recommends that petitioner's petition for

15  a writ of habeas corpus be denied and that the Clerk of the Court be directed to enter judgment

16  and close this file.

17       These amended findings and recommendations are submitted to the United States

18  District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within

19  ten days after being served with these amended findings and recommendations, any party may file

20  written objections with the court. The document should be captioned "Objections to Magistrate

21  Judge's Amended Findings and Recommendations." Failure to file objections within the specified

22  time may waive the right to appeal. See Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

23  DATED:   March 7, 2007.

24

25  _____

26  **CRAIG M. KELLISON**
    UNITED STATES MAGISTRATE JUDGE

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26